## GALVESTON ELECTRIC CO. v. CITY OF GALVESTON et al.

(District Court, S. D. Texas, at Galveston. February 10, 1921. On Motion for Rehearing, April 27, 1921.)

No. 40.

*(Syllabus by the Court.)*

1. **Carriers ☞18(6)—No injunction granted against rates, unless case so clear court must say they deny just compensation.**

    It is the function of the legislative and not of the judicial branch to make rates, and no injunction ought to be granted against the collection of rates established under legislative sanction, unless the case is so clear and free from doubt as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation ror private property taken for public use.

2. **Corporations ☞393—Regulation of public service corporations to be exercised with keen sense of justice and met with frank disclosures, and injunction not to relieve parties from these obligations.**

    "Regulation of public service corporations is a delicate and dangerous function, and ought to be exercised with a keen sense of justice on the part of the regulating body, and met with frank disclosures on the part of the company to be regulated," and the granting or refusal by the court of an injunction in no manner relieves either party to the controversy from the recognition of these obligations in their future dealings.

3. **Carriers ☞12(5)—In fixing value of street railroad for rate base, adding 33¹/₃ per cent. to pre-war cost approved.**

    In fixing the present value of a street railway company for the purpose of a rate base, the reproduction method should be applied reasonably, and as applied to the inflated values which have arisen since and because of the war it must appear that the level of prices is not transitory.

    The finding of the master, therefore, that the prices obtaining at the time of the valuation in 1920 were transitory, and not likely to continue thereafter, and that a price level of 33¹/₃ per cent. above the pre-war cost is a fair estimate in arriving at the rate basis, is approved.

4. **Carriers ☞12(5)—Street railroad not entitled to brokerage allowance in determining value for a fair return.**

    A street railroad company *held* not entitled to an allowance for brokerage in determining the value on which it is entitled to earn a fair return.

5. **Carriers ☞12(5)—While street railroad valued as going concern for rate-fixing purposes, addition for development cost or cost of attaching business not allowable.**

    While for the purpose of determining the value of the property of the street railway company for rate-fixing purposes the property should be valued as a going concern, and due allowance made therefor, no allowance should be made for going concern value, in the sense of "development cost," and where valuation has been made on the basis of a plant in full operation, with due allowance for reproduction cost and all overhead expenses during construction, including organization costs, an addition for development cost or cost of attaching business is not allowable.

6. **Carriers ☞12(5)—Past earnings not considered, where street railroad plant is fully valued on reproduction cost basis for fixing rates.**

    The true rule in any case where a plant is fully valued upon the cost of reproduction basis is that the allowance of any element for "development cost" cannot in a judicial procedure be reasonably sustained, for the reason that such a utility is entitled to a reasonable rate of return upon its plant from the day it goes into operation, and the court does not take

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

into consideration at all whether the years of its past history have been lean or fat.

**7. Carriers ☞12(5)—In determining income street railroad may earn on investment, income tax not deducted.**

In determining the income which a street railroad company is entitled to earn as a fair return on its investment, it is not entitled to deduct the amount of federal income tax imposed on it.

**8. Carriers ☞12(5)—Maintenance requirements of street railroad fixed in light of past history as affected by present conditions, where increase since 1918 is 136 per cent.**

Where the evidence shows an increase in maintenance figures from $40,000 in 1918 before the rate controversy commenced to $92,000, or over 136 per cent., the actual maintenance charges must be regarded as too unreliable to be taken into account in fixing maintenance for the future, and maintenance requirements must be fixed in the light of the past history of the company, as affected by present conditions.

**9. Carriers ☞12(5)—Street railroad fare ordinance held not so clearly confiscatory as to authorize injunction without permitting operation for further period.**

Though it appeared from the report of the master and the findings of the court thereon that, under an ordinance fixing the rate of street car fare for adults in the city of Galveston at 5 cents, the company had earned during the preceding year less than a fair return, to wit, 5 per cent. upon the fair value of its investment, since the reference to the master was only for advisory purposes, and additional evidence, taken after the coming in of his report, showed such a large and steady increase in operating returns as that, if they continued, the company's earnings would be for the ensuing year approximately 8 per cent., *held*, that the ordinance is not so clearly confiscatory as to authorize the court to enjoin its enforcement without permitting its operation for a further period.

On Motion for Rehearing.

**10. Carriers ☞12(5)—Street railroad entitled to allowance for expense of grade raising in determining valuation for rate-fixing purposes.**

That portion of the former opinion denying grade raising reversed; it appearing on rehearing that this expense has not been reflected in any manner in the valuation of the property, and that the grade raising has added to the value of the property at least the amount of the expenditure.

**11. Carriers ☞12(5)—In valuing street railroad plant for rate purposes, amount of overhead items arrived at by taking percentage of appreciated physical property increases in same ratio.**

Though, in appreciating pre-war costs, to arrive at reproduction value of the plant, overhead items should not as items be increased in value, yet, since the amount of them was arrived at by taking a percentage of the physical property, when that physical property is appreciated, the overheads must necessarily increase in the same ratio.

**12. Carriers ☞12(5)—In arriving at depreciation annuity in determining street railroad rates, sum of overhead items excluded is basis.**

In arriving at depreciation annuity, only those items of the plant which are susceptible of annual depreciation should be taken into account; therefore the sum of all overhead items should be excluded from the sum taken as the basis for these amounts.

**13. Carriers ☞12(5)—In determining street railroad rates, no increased allowance on maintenance account made for deferred maintenance.**

No increased allowance on maintenance account can properly be made for what is called by the company "deferred maintenance," a condition of excessive maintenance requirements, due to the failure of the company to keep its property in a proper state of maintenance. Such deferred maintenance must either be made good by the company out of net earn-

ings, or the property should be revalued, with an additional deduction on account of the accrued depreciation due to this condition.

In Equity. Suit by the Galveston Electric Company against the City of Galveston and others. On exceptions to report of master. Sustained in part, and decree for defendants.

C. R. Wharton, of Houston, Tex., Ballinger Mills, of Galveston, Tex., and William E. Tucker, of Boston, Mass., for complainant.

Frank S. Anderson, City Atty., and McDonald & Wayman, all of Galveston, Tex., for defendants.

HUTCHESON, District Judge. This is a rate case arising out of the application by complainant for an injunction to restrain the defendants from enforcing an ordinance fixing the street car fare for adults in the city of Galveston at five cents. A hearing on the application for temporary injunction was had, and on that hearing the city's contention that there was a franchise ordinance fixing irrevocably a five-cent fare was tentatively overruled by me, and an investigation as to the confiscatory character of the rate was entered upon.

On the final hearing, since, as the opinion discloses, the conclusion was reached by me that the ordinance was not confiscatory, and since a similar question involved in the San Antonio rate case is now before the Supreme Court of the United States on appeal, I have not thought it necessary to definitely decide the point as to the irrevocable effect of fixing the rate at five cents in the franchise, and this opinion will be addressed only to the exclusive rate features of this controversy.

In this case a master was appointed in order that the testimony might be adduced at the convenience of the parties, and that its scope and meaning might be, through the arguments of parties and the conclusions of the master thereon, better grasped by me. This being the nature of his appointment, his findings will not be taken by me as binding, but only as advisory and in aid of a right conclusion.

In view of these facts, and of the well-settled principle applicable to suits of this character, that a finding of a master, even though confirmed by the district court, is not binding upon the Supreme Court, it may be unnecessary that the exceptions be specifically disposed of; but, since no harm can come from such a course, I shall dispose of the exceptions, in order that both my views may be indicated on the precise points raised, and that, if the exceptions are of legal value to either party, they may have them.

[1] It is undoubtedly true that public utilities, state and municipal rate-making bodies, their counsel, and the courts in hearings of this kind realize, in a general way, the basis upon which the adjudication proceeds; but it is also true that there is a marked tendency in these rate controversies to forget the basic principles upon which the decisions rest, and as the frequency and magnitude of these controversies increase, and decision piles on decision, the original foundations of the purely judicial decisions are sometimes lost sight of, and the whole superstructure takes a leaning which would be avoided if the nature of the pillars on which it rests were kept clearly in mind. These founda-

tion pillars, two in number, having been hewn and shaped by the decisions of the Supreme Court, are broad and enduring, and are a sufficient basis for the whole structure of the law which has been built upon them.

The first is that principle which inheres in sovereignty, "the power to govern men and things," in short, the police power, in the contemplation of which it was authoritatively declared in Munn v. Illinois, 94 U. S. 125, 24 L. Ed. 77, that, when private property is devoted to a public use, it is subject to public regulation, and that such regulation is not in itself obnoxious to the Fourteenth Amendment.

The second are those provisions of the Fourteenth Amendment which guarantee the equal protection of the laws, and which inhibit the deprivation of property without due process of law. It was with reference to these provisions that the Supreme Court said, in Reagan v. Farmers' Loan & Trust Co., 154 U. S. 399, 14 Sup. Ct. 1055, 38 L. Ed. 1014:

"The equal protection of the laws, which, by the Fourteenth Amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public."

And later decisions of that tribunal, dealing specifically with matters of rate legislation and public control, have, with clearness and vigor, marked the outlines of the two principles and the respect and authority which must be conceded to each. I think no utterance of the Supreme Court upon this view of the matter has been better expressed, or more rigidly adhered to, than that in the case of San Diego Land Co. v. National City, 174 U. S. 753, 19 Sup. Ct. 810, 43 L. Ed. 1154:

"That it was competent for the state of California to declare that the use of all water appropriated for sale, rental, or distribution should be a public use and subject to public regulation and control, and that it could confer upon the proper municipal corporation power to fix the rates of compensation to be collected for the use of water supplied to any city, county or town or to the inhabitants thereof, is not disputed, and is not, as we think, to be doubted. It is equally clear that this power could not be exercised arbitrarily and without reference to what was just and reasonable as between the public and those who appropriated water and supplied it for general use; for the state cannot by any of its agencies, legislative, executive, or judicial, withhold from the owners of private property just compensation for its use. That would be a deprivation of property without due process of law. * * * But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without just compensation as under all the circumstances is just both to the owner and to the public; that is, *judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use.*" (Italics mine.)

This view has not only been reaffirmed in subsequent cases, but has been given direct application in the refusal of the Supreme Court to consider applications for injunction against municipal rates, unless

the rates complained of shall have had a fair and reasonable trial, the period taken in most cases being substantially one year.

In Knoxville v. Water Co., 212 U. S. 8, 29 Sup. Ct. 150, 53 L. Ed. 371, the court, in answer to the suggestion that the act of the municipality is not the act of the state, said:

"It happens that in this particular case it is not an act of the Legislature that is attacked, but an ordinance of a municipality. Nevertheless, the function * * * is purely legislative in its character, and this is true, whether it is exercised directly by the Legislature itself or by some subordinate or administrative body. to whom the power of fixing rates in detail has been delegated. The completed act derives its authority from the Legislature and must be regarded as an exercise of legislative power. There can be at this day no doubt, on the one hand, that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that that power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and where that invalidity rests upon disputed questions of fact the invalidating facts must be proved to the satisfaction of the court."

In that same case (212 U. S. 15, 29 Sup. Ct. 153, 53 L. Ed. 371) it was said:

"The precise subject of inquiry was: What would be the effect of the ordinance in the future? The operations of the preceding fiscal year, or of any other past fiscal year, were valueless if the year was abnormal, and were only of significance so far as they foretold the future. * * * But evidence of the operations of the years succeeding to the ordinance is relevant and of great importance, and by a consideration of such evidence a much greater degree of certainty could be obtained."

Again, in the case of Knoxville v. Water Co., 212 U. S. 16, 29 Sup. Ct. 153, 53 L. Ed. 371, quoting from Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764:

"No injunction ought to be granted unless in a case reasonably free from doubt. We think such rule is, and will be, followed by all the judges of the federal courts."

And again, in the same case, quoting from San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892, it is said:

"'In a case like this we do not feel bound to re-examine and weigh all the evidence, although we have done so, or to proceed according to our independent opinion as to what were proper rates. It is enough if we cannot say that it was impossible for a fairminded board to come to the result which was reached.' It cannot be doubted that in a clear case of confiscation it is the right and duty of the court to annul the law. Thus * * * in Covington Turnpike Co. v. Sandford, 164 U. S. 578, where the rates prescribed would not even pay operating expenses; in Smyth v. Ames, 169 U. S. 466, where the rates prescribed left substantially nothing over operating expenses and cost of service; and in Ex parte Young, supra, where, on the aspect of the case which was before the court, it was not disputed that the rates prescribed were in fact confiscatory. * * * But the case before us is not a case of this kind. * * * The valuation of the property was an estimate and is greatly disputed. * * * The conclusion of the court below rested upon that most unsatisfactory evidence, the testimony of expert witnesses employed by the parties."

In the Minnesota Rate Cases, 230 U. S. 433, 33 Sup. Ct. 754, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, it was said:

"The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the Legislature, or of the commission lawfully constituted by it, as to matters within the province of either. * * * The property of the railroad corporation has been devoted to a public use. There is always the obligation, springing from the nature of the business in which it is engaged, * * * that there shall not be an exorbitant charge for the service rendered. But the state has not seen fit to undertake the service itself, and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection, which extends not merely to the title, but to the right to receive just compensation for the service given the public. * * * The general principles which are applicable in a case of this character have been set forth in the decisions: (1) The basis of calculation is the 'fair value of the property' used for the convenience of the public. * * * Or, as it was put in San Diego Land & Town Co. v. National City, 'what the company is entitled to demand in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' * * * (2) The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

These principles are so well established as to require no further elaboration, but their application to a case in hand presents the greatest difficulty. If in this case the facts which go to make up value were undisputed, or could be determined by rule of thumb, and with absolute accuracy, there would be no difficulty in determining the rights of plaintiff and its remedy. But since the vexing question is the value of the property now being used by the public, and since there is no market value for that property in the ordinary sense of a free market, where commodities or property are passed by purchase and sale; but its value for rate purposes must be determined largely by a fumbling process of unscrambling the elements which have gone into the plant, for the purpose of rescrambling them, and many features of this valuation are determinable only by conjecture, and upon the most unreliable of testimony, it is clear that upon well-established principles the burden rests upon the complainant, not merely to establish his case by a preponderance of available evidence, but to make his right to relief so clear and plain that there remains no doubt in the mind of the court that he is so entitled.

The foregoing statement of the attitude of this court toward the question at issue ought to make it plain that a wholly different duty and obligation rests upon the city council in the matter of establishing rates than that operative here, and it ought to be evident that the failure of this court to inhibit the ordinance as confiscatory is in no sense a judgment that in the opinion of this court the rates and practices complained of are fair. It is merely a judgment that this court, starting with the assumption, which the law requires, that the city council has tried fairly, conscientiously, and in a wholly impartial manner to fix just rates, is not able to declare "that it was impossible for a fair-minded board to come to the result which was reached."

[2] Municipal bodies should take with the utmost seriousness and conscientious fairness their important and authoritative position as bodies of wise and disinterested administrators, and should not force

public utilities to apply to the courts for protection, for, as the Supreme Court has said in the case of San Diego Land Co. v. National City, 174 U. S. 754, 19 Sup. Ct. 810, 43 L. Ed. 1154:

"Such a question is always an embarrassing one to a judicial tribunal, because it is primarily for the determination of the Legislature or of some public agency designated by it."

And it cannot but be a deplorable situation for any community to find itself in, if its legislative tribunal is so wanting in courage and fairness as that the rates and practices which its public utilities are allowed to use are "only those which fall just short of confiscation."

In the year 1914, while city solicitor of the city of Houston, in a brief filed with the city council in a rate investigation involving the Houston Light & Power Company, I took occasion to say:

"As this matter stands before the council, it presents no case for partisan action, but rather for the wise, calm, and judicious exercise of a sound and unbiased judgment to bring about the thing desired, which is the fixing of a rate which will not be too high for the public to pay, but will at the same time not be too low for the public service company to receive."

And further in the brief:

"In Knoxville v. Knoxville Water Co., 212 U. S. 18 [29 Sup. Ct. 154, 53 L. Ed. 371], where the city of Knoxville appealed from a decree enjoining the rates fixed by it, the court says: 'The courts in clear cases ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. Regulation of public service corporations which perform their duty under conditions of necessary monopoly will grow in greater and greater frequency as time goes on. It is a delicate and dangerous function, and ought to be exercised with a keen sense of justice on the part of the regulating body, and met with frank disclosures on the part of the company to be regulated. The courts ought not to bear the whole burden of saving property from confiscation, though they will not be found wanting where the proof is clear. The Legislature, and subordinate bodies to whom the legislative power is delegated, ought to do their part. Our social system rests largely on the sanctity of private property, and that state or community which seeks to invade it will soon discover its mistake by the disasters which follow. The advantage to the consumer, which he will gain in the reduction in the rates charged by public service corporations, is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence. On the other hand, the companies to be regulated will find it to their lasting interest to furnish freely the information upon which a just regulation can be based.' The nobility and wisdom of this language cannot be challenged, and both municipal bodies and public service companies owe it to themselves to approach the matter of rate regulation in the spirit of fairness, and the desire to do justice, thus suggested by the Supreme Court.
* * *

"It thus appears that this council acts in the capacity of fairly fixing rates, not as a judge passing sentence upon a culprit; not as a partisan tribunal levying all the tariff can bear, but as a body of wise and disinterested administrators, seeking at the same time to serve the interests of the citizens, the interest of the public, and the interests of the public servant."

The brief concludes with this language:

"It is not amiss for me to say that the council occupies a somewhat different position from that of a court, in that the council is not required to simply declare its judgment on the evidence before it, but has the right and power, as representing the public, and it should be its aim and purpose not merely to

`pronounce a legal judgment as to what rate would be short of confiscatory, but to arrive at and agree upon a fair rate, though said rate should be considerably in excess of the lowest rates which the courts would sustain and allow. In other words, if the company exhibits a spirit of fairness and concession, with the view of agreeing upon a fair and reasonable rate, it is clear that the council is not only authorized, but should endeavor, to meet them in that spirit."

To the litigants and their counsel in this and similar cases before me I commend these expressions, not because of the wisdom of the author, but because they bear the sanction of the authority of the Supreme Court of the United States, adding to them the declaration that, if at any time it should appear to me that any order made by me in this or any similar case now or hereafter pending before me is being used by the parties to it for any other purpose and to any other extent than its terms express, in short, if it should appear to me that a city counsel, resting upon a court order, has abandoned its legislative function, and is refusing to consider from that standpoint such proper adjustment of the rates as the actual experience of the utility shall show it entitled to, or if a utility, where the order is in its favor, is using such order as propaganda in an effort to unduly increase its rates, this court will, of its own motion, or upon application of the other party, amend or vacate the order so as to deprive the offending party of its benefits, and to that end the decrees in this and similar cases will be drawn.

Approaching, then, the consideration of the case at bar in the light of these principles, and with the purpose of determining whether, either upon the admitted facts, or facts, if not admitted, yet clearly established, the exercise of sovereignty complained of in this case must be inhibited by this court because, in the language of Justice Harlan, "it appears to the court impossible for a fair-minded body to come to the result which was reached," I shall proceed to the disposition of the exceptions to the master's report, and in disposing of them shall make my own findings, so far as I deem them necessary to determine the points at issue, not only in the light of the testimony taken before the master, but in that furnished by the additional testimony taken by me upon the matter of price levels, operating cost, and operating income for the period ending December 31, 1920.

## Cost of Reproduction.

[3] The first exception of the defendants, and the first seven exceptions of the complainant are leveled at the master's act in appreciating the agreed historical reproduction cost of the property by 33⅓ per cent. in order to reach a valuation reasonably in line with present-day values. In the submission of the case to the master the parties agreed that the property ought to have cost, on the basis of prices prevailing at the time it and its various units were constructed, $1,715,825.

The complainant contended that this value should be appreciated by a sufficient percentage factor to make that agreed value actually conform to the present-day value of the plant. The defendants contended that this agreed figure should have been taken as the basis of

the value for rate-making purposes of the depreciable property, less a reasonable and adequate deduction for accrued depreciation. In these positions the complainant contended for the application of the cost of reproduction theory; the defendants, while admitting the general correctness of such theory, denied its application to the case at bar on the ground that these were unusual times, and such appreciation as existed was abnormal and fugitive, and not a proper basis for rate making.

It was substantially agreed by all the witnesses that the values and costs, as of the time that the master made the investigation in the summer of 1920, were greatly higher than those employed in the agreement, and such testimony was taken as to price trends and tendencies for the future bearing upon the contention, on the one hand, that the present conditions were reasonably normal, and, on the other hand, that they were abnormal and fugitive. The estimates of excess percentages over the values taken in the agreed statement ran as high as 110 per cent.

The position of defendants' witnesses was that the price trends were rapidly toward a pre-war basis; of the complainant, that those trends would settle to a present price level of about 66 per cent. above the basis taken for the agreed figure. It was the master's view, under all the circumstances, that it ought to be determined by him that 33⅓ per cent. was a normal standard for appreciating the agreed values, and this percentage he adopted. Though both complainant and defendants vigorously attack this finding, I shall confirm it, because I believe that it has been arrived at in the exercise of a "reasonable judgment having its basis in a proper consideration of all relevant facts."

A brief review of the authorities upon this much-mooted question of cost of reproduction will, I think, show that the court is not justified in disturbing the master's finding in this particular. There can be no doubt that the criterion is the present value of the plant. There can be equally no doubt, on the other hand, that the Legislature cannot, in periods of acute depression, reduce rates on the theory that a valuation of the plant has been fixed thereby, and, on the other hand, that it cannot be compelled to raise rates in periods of enormous and temporary inflation, on the theory that the value of the plant for rate-making purposes, has been thereby increased.

In San Diego Town Co. v. National City, 174 U. S. 757, 19 Sup. Ct. 811, 43 L. Ed. 1154, the court said:

"The basis of calculation suggested by the appellant is, however, defective in not requiring the real value of the property * * * to be taken into consideration. What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public. The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed and which went into the plant may be in excess of the real value of the property."

In the Minnesota Rate Cases, 230 U. S. 450, 33 Sup. Ct. 761, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, where the cost of reproduction method was applied by the master, so as to allow

the railroads an immense increase over cost, the court declined to follow the master, and said:

"These are the results of the endeavor to apply the cost of reproduction method in determining the value of the right of way."

And on page 452 of 230 U. S., on page 761 of 33 Sup. Ct. 729 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18):

"The cost of reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and, if it rests upon disputed questions of fact, the invalidating facts must be proved. And this is true of asserted value as of other facts."

In Lincoln Gas Co. v. Lincoln, 250 U. S. 268, 39 Sup. Ct. 458, 63 L. Ed. 968, a cause argued on October 5, 1917, and decided June 2, 1919, the court said that the complainant should be authorized to make another application to the court for relief—

"if it can show, as a result of its practical test of the * * * rate since May 1, 1915, or upon evidence respecting values, costs of operation, and the current rates of return upon capital as they stand at the time of bringing suit and *are likely to continue thereafter, that the rate ordinance is confiscatory in its effect under the new conditions.* It is a matter of common knowledge that, owing principally to the World War, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted, and largely since this cause was last heard in the court below. And it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested * * * a few years ago furnishes no safe criterion for the present, or for the future." (Italics mine.)

Judge Learned Hand, in Consolidated Gas Co. v. Newton (D. C.) 267 Fed. 231, announced the principle correctly in this language:

"It must, of course, appear that the variation in prices is not transitory. * * * But, once it appears that the new price levels are not transitory, it is no answer to the company's complaint to say that at some future time prices may fall."

It was the view of the master, and I adopt it, that the prices obtaining at the time of the valuation were transitory, or, to use the language of the Supreme Court in the Lincoln Case, it was his view that they were not "likely to continue thereafter." It was his view, and I concur with him, that a price level of about one-third above the agreed cost submitted to him could reasonably be assumed to have sufficient permanency to base a finding on.

The Supreme Court has, in 1919, stated that it was a matter of common knowledge that costs of labor and supplies of every kind have greatly advanced. I think it is equally a matter of common knowledge that all of these costs are on the decline, and just as in the last half of 1919 and the first half of 1920 the phenomenon of higher and yet higher prices was of worldwide scope and universal experience, now the phenomenon of lowering and ever-lowering prices is equally manifest.

In the hearing before me supplementary to that before the master, the evidence as to price trends was marked. Indices on commodity prices furnished by the Bureau of Labor Statistics showed a decline from September, 1920, which were the figures obtainable when the master made his report, from 250 to 189 on all commodities, with an accelerating drop for each ensuing month, and the testimony sustained this view. Since that time, the current financial news of the world, which I think is a matter which this court can take judicial knowledge of, as shown in standard financial publications, is to the effect that the process of deflation has not been completed; that there are still many channels in which the price reductions recorded are inadequate to meet the requirements for a return to stable conditions; that these reductions are not only coming in materials, but necessarily in the labor which enters into their production, increased and hastened by the great increase in unemployment, the shutting down of plants, and the resumption of such as do resume on wage reductions.

According to the Bankers' Commodity Price Index, the average price of all commodities was on the 1st of January, 1920, 439.30 compared with 358.77 on August 1, 1914, or an increase of approximately only 33⅓ per cent. Nothing, however, in any of these views, leads me to believe that a permanently lower price level may reasonably be reached for some time to come than the one taken by the master of 33⅓ per cent., and his finding on this point will therefore be adopted by me without change.

It follows, therefore, that the first exception of the defendants, and exceptions 1 to 7 of complainant, inclusive, will be overruled.

### Brokerage.

[4] The second exception of the defendants is leveled at the allowance by the master of $67,078 for brokerage. This exception I sustain. I cannot see that this item stands on any different footing than an interest charge for obtaining money, and it has for a long time been recognized that the interest which complainants pay upon their bonds, or for the securing of money, has no part in a rate controversy.

The value of the property in these cases is determined by its cost, either actual or reproduction, and this cost cannot truly be said to be increased or diminished by the rate of interest paid; but such interest charges as are paid must be taken care of annually, and not capitalized on for a permanent earning basis. As to this particular plant, under the facts I hold that its brokerage, if it paid any, has or should have been amortized long ago, for, as the Supreme Court said, in the Knoxville Water Company Case, speaking of the effort on the part of the company to obtain a higher valuation on account of the depreciated property through failure to make replacements:

"If, however, a company fails to perform this plain duty, and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon overissues of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question, the true value of the property

then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past."

If it is sought to include brokerage on the ground that this is merely an assumed brokerage, upon the theory that in the reproduction it would be necessary to pay the brokerage, the answer to that contention would be twofold:

(1) There is no basis for such an assumption here, in view of the actual facts in this case, as to the method by which this plant was created through a long period of time, by accretions.

(2) If in any case brokerage is allowable, I incline to the method suggested by the defendants of amortizing it through the period in which the franchise has to run, rather than setting it up as a permanent addition to the capital, making a return on it of 8 per cent. per annum a perpetual charge against the public.

## Grade Raising.

[5] The third exception of the defendants to the master's allowance of $136,000 expended by the company in grade raising, as a part of the general grade raising of the city of Galveston necessitated by the tropical storm, I sustain. On the oral argument of this case, not correctly apprehending the nature of this allowance, and thinking it occupied the same position of a fill or ordinary embankment, it was my impression that the master was correct. On reflection, I am certain that it should be disallowed, nor do I think the reasons against it can be better stated than in the language of the complainant in the argument for it:

"If the Galveston Electric Company and its predecessors were to continue to give street car service, it was absolutely essential that the grade of their tracks should be raised to correspond with the general grade-raising project. The expenditure was therefore a necessary one, in order to place the property of the street railway company in such a condition as to continue to serve the public. As a matter of fact, it seems clear that the properties of the company were actually increased in value by the amount of the expenditure, because of the fact that the company has thereby, in large measure, removed a source of recurring danger to its property, and has thereby put itself in better position to serve the public."

These contentions are undoubtedly true just as made, but it follows therefrom, not that this item should be allowed, but that it should be disallowed:

(1) Because, if this expense had not been incurred, and the plant of the company were valued with the tracks and properties below the grade, they would have to be valued much less than is now the case, so that in an absolute sense it is true, as stated by counsel, that the properties of the company have been actually increased in value by the amount of the expenditure. This being the case, and due allowance having been made for it in the valuation, to allow it again would be unjust and excessive, as a double valuation.

In addition to this reason, it is defeated by two other considerations.

The first is, the property having been valued on the reproduction basis, no allowance should be made for grade raising, in view of the fact that, since the entire city of Galveston, where the tracks run, has been raised, the reproduction of the plant would not be attended with this cost; and second, if it be treated as a loss, and if the cost expended on it has not in fact gone into and been allowed in the valuation of the plant, this loss is in reality a storm loss, which the public cannot be required to pay earnings on, any more than it could be required to pay on the valuation of the buildings destroyed by the storm, or cars or personal property wrecked or swept away.

The sustaining of this exception requires the disallowance, not only of $136,000, but of $6,000 engineer's cost involved in the grade-raising project. The result, therefore, of sustaining the third exception, will be that I strike out from the master's estimate of valuation a total of $142,000.

This disposition of the matter, of course, requires the overruling of complainant's exception No. 8, which is now done.

## Depreciation.

The fourth exception of defendants, having to do with depreciation, I overrule. I am of the opinion that the actual depreciation testified to by the engineer, Gillette, whose testimony and bearing on the stand has evidently impressed the master, as it impressed the court, most favorably, presents the matter fairly and reasonably, and I shall allow depreciation in the sum which the master took.

## Going Concern (Development Cost).

[6, 7] I sustain the fifth exception of the defendants, addressed to the action of the master in allowing for development cost or going concern value $530,000. I think it clear that in this particular the master erroneously followed the practice adopted by some state Public Utility Commissions.

It might well be that a rate-making body would be justified in adding something of value to the plant as ascertained to compensate it for lean years, and it might also be that in reviewing the action of such body a court or master might set up such a basis of valuation for itself, as, for instance, a "bare-bones" or junk valuation, as that to fairly determine the issue some addition would have to be made on this score. In view of the valuation used by the master in this case, of historical reproduction cost, with an appreciation added for the present-day valuations, with all overheads (see table below) properly added and allowed for, taking the city of Galveston as it is, with a street car service already fully developed, and a public demanding street car service, and certain to take advantage of it, an allowance for going concern in this case, in addition to the allowances already made, as a basis for enjoining the exercise of a legislative prerogative must be discarded.

Table of Overheads.

| | |
|---|---:|
| Engineering and supervision | $ 60,000 |
| Law expense | 7,029 |
| Interest during construction | 44,179 |
| Injuries and damages during construction | 11,492 |
| Taxes during construction | 7,383 |
| Organization and business management | 73,281 |
| | $203,344 |

It is very evident that the parties, in making their agreement on value, and the master, in valuing the plant, valued it as a plant in use, and not in any sense as junk, or a dead and idle property. The agreement between the parties showed plainly that they had included everything in the valuation of the property except the franchise value, going-concern value in the sense of development cost, bond discount, and brokerage, and it is evident that the master, in making his allowance for this item, made it, not for the purpose of making a distinction between junk and live value, but in order to add to his valuation an allowance for development cost somewhat analogous to the procedure earlier adopted by the Wisconsin Public Utilities Commission.

In any case, where a plant is fully valued upon the cost of reproduction basis, the allowance of any element for development cost cannot, in a judicial proceeding, be reasonably sustained for the reason that such a utility is entitled to a reasonable rate of return upon its plant from the day it goes into operation, and the court does not take into consideration at all that there may be lean years before the fat ones. Therefore a court in a rate case has nothing to do with any increment to the actual value of the plant acquired by the successful operation of it, nor in a case of valuation, where the cost of the plant and its historical development is determined, does the court add anything to its capitalization for rate-making purposes for its unsuccessful years, nor deduct anything for its successful ones.

This view has full support in the Minnesota Rate Cases, 230 U. S., where the court on page 454, 33 Sup. Ct. on page 762 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), says:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law. But still it is property employed in a public calling, subject to governmental regulation and while under the guise of such regulation it may not be confiscated, it is equally true that there is attached to its use the condition that charges to the public shall not be unreasonable. And where the inquiry is as to the fair value of the property, in order to determine the reasonableness of the return allowed by the rate-making power, it is not admissible *to attribute to the property owned by the carrier a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the es-*

*sential conditions of the public use, and to make the public use destructive of the public right."* (Italics mine.)

And again on page 458 of 230 U. S., on page 764 of 33 Sup. Ct. (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), it is said :

"It must be remembered that we are concerned with a charge of confiscation of property by the denial of a fair return for its use; and to determine the truth of the charge there is sought to be ascertained the present value of the property. *The realization of the benefits of property must always depend in large degree on the ability and sagacity of those who employ it, but the appraisement is of an instrument of public service, as property, and not of the skill of the users."* (Italics mine.)

I have already in this opinion quoted from 212 U. S. the proposition that the present valuation cannot be enhanced by errors of losses in the past. I think it clear, therefore, that if the court, as a basis for inhibiting legislative action, should add to the property a purely speculative increment of going concern upon the view that the public, by using the property, has increased its value. It would be doing what the Supreme Court has forbidden; that is, it would disregard the essential conditions of the public use, and "make the public use destructive of the public right." In short, when "going concern" is stripped of its involvement and obscurity, its attractive names and titles, it presents itself on the one hand where the past record of the utility has been profitable, as nothing more than good will, which the courts have always refused to allow, and, on the other hand, where the past record has been unprofitable, as nothing more than an effort to capitalize errors and misfortunes, as to the impropriety of which the decisions of the Supreme Court are equally clear.

The confusion which has resulted in this matter is that which springs from the failure to distinguish the essential principle involved in these rate controversies, that a utility is entitled to earn on its property a fair return, and that the rate can neither be increased, on the one hand, by the fact that the company has enjoyed a profitable business, nor decreased, on the other hand, by the fact that its business has been unprofitable, either because of the lack of support of the utility by the people of the community, or of any other untoward features which would gravely affect the company, if its property were valued for the purpose of bargain and sale.

I think this is best illustrated in the case of Denver v. Denver Union Water Co., 246 U. S. 191, 38 Sup. Ct. 278, 62 L. Ed. 649, where it was sought to diminish the return to which the company was entitled by the fact that it was operating without a franchise. The majority of the Supreme Court denied this contention, saying on page 190 of 246 U. S., on page 282 of 38 Sup. Ct. (62 L. Ed. 649) :

"There can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service, nor can it be doubted that the property must be valued as property in use. It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its 'junk value.' Nor is the question of value for present purposes greatly

affected, if at all, by the fact that there is neither right nor obligation to continue the use perpetually, or for any long period that may be defined in advance. The reason is not obscure. The cost and detriment to a property owner attributable to the use of his property by the public, and the value of the service rendered by the property to the public, are measured day by day, month by month, year by year, and are little influenced by the question how long the service is to continue. The cost of the service includes the use of the plant, but, ordinarily, not its destruction, except through the slow processes of wear and tear and obsolescence, for which graduated depreciation allowances are made. The whole calculation is a matter of income, not capital, accounting; and the cost and value of the use of a given property for a stated period is the same whether the use is to be continued after the expiration of the period or not."

In short, the real question here is the value of the plant in operation, and this value should be the same for rate-making purposes, whether its past history has been successful or unsuccessful. I have therefore sustained the exception to this feature of the master's report, and have myself valued the property, as I think, in the light of the evidence, it should be valued, as a complete and going concern, useful and ready to serve the public, with its organization perfected and in shape, and its public ready and waiting to be served.

### Rate of Annual Depreciation.

The sixth exception of the defendants challenges the master's depreciation allowance. This I sustain, for, though I approve the rate adopted by the master, the application of that rate to the value found by me will necessarily produce a different sum for depreciation allowance.

### Income Tax.

[8] The seventh exception of the defendants goes to the allowance of income tax, and neither counsel have cited me to any decision by the Supreme Court on this point, and outside of the opinion of Judge Hand, in 267 Fed., supra, I have found no court expression on the subject.

It is therefore, as far as this court is concerned, an open matter, and I am of the opinion that no reasonable theory permits its allowance. Doctrinaires and writers upon tax subjects all agree that the income tax is designed to bear directly upon the subject in such a way as that its incidence cannot be shifted to others. In view of the steadily rising complaint against these taxes as in part responsible for higher costs, because their incidence is shifted to the general public, I would be rash, where not compelled to, to undertake to decide whether in practice the theory of the doctrinaire works out; but I think it cannot be doubted that it was the purpose of the states in adopting the amendment to the Constitution, and of Congress in imposing the tax, that the tax should operate directly as a charge against ascertained earnings, and not in any sense to be a direct tax on property, and it was anticipated and supposed that persons subject to it should have their earnings diminished to the extent of this tax. Counsel on page 47 of their brief say:

"It must be borne in mind in this connection, that the Galveston Electric Company is a public service corporation, and that the Constitution guarantees it a fair return upon the value of its property."

This statement is wholly erroneous, and must have been made without thought. The Constitution makes no guarantee to the complainant, except to protect against legislation which would deprive the company of the right to charge rates adequate to produce a fair rate of return. If counsel's major premise that the Constitution guarantees a fixed net for return were correct, his conclusion is right, but that this proposition is unsound is manifest. Certainly the Constitution does no more than to say to the complainant that the Legislature cannot force it to operate at such rates as will deprive it of a return similar to that enjoyed generally by enterprises in that community. The basis of the rate of return is arrived at by analogy to earnings of other enterprises in the community, all of which on their 8 per cent. return pay income tax. It certainly cannot be that the courts, in declaring that the right to a fair return could not be abridged, intended to create a more favored class out of public utility concerns, so as to allow them to receive their 8 per cent. free of income tax, while all other persons in the vicinity who receive the same per cent. have to pay it.

The tenth and last exception of complainant I must necessarily overrule, in view of my action on the preceding exceptions.

### Result of Rulings on Exceptions.

[9] The revision of the figures of the master, in the light of the rulings upon the exceptions, produces the following result, which will be taken by me as correct for the decision of this case:

From the agreed historical reproduction cost of the property actually in service of $1,715,825, taken by the master, since I have disallowed both the items of grade raising and brokerage, deducting $142,281 for grade raising, including engineer's cost in connection with it, and allowing nothing for brokerage, I take as the base value of the property $1,573,544.

To the base value the master added 33⅓ per cent. of the depreciable items, and in this I have sustained him. Since, however, I also sustained complainant's exception to the master's failure to appreciate the overhead items which enter into the total cost, I determine the amount of appreciation by deducting only $282,000 for the items of working cost, real estate, and additions to the property since January 1, 1915, thus reaching for my figure, for the value of the depreciable items on the basis of historical reproduction cost, $1,291,325.

Appreciating these items, as the master did, by 33⅓ per cent., of $240,441, I reach a total of the present-day value of depreciable items of $1,721,766. Now, restoring to my total the items aggregating $282,000, a figure is reached by me for the undepreciated value of the plant of $2,013,985, a figure very close to that adopted by the master of $2,167,805.

Deducting from this figure the accrued depreciation used by the master of $520,000, and declining, as I have, to add anything for going concern value, I reach as the value of the plant of complainant, now in the service of the public, the figure of $1,493,985, in lieu of which, since these figures are at best estimates, and even figures are easier to deal with, I take the figure of $1,500,000 as that value of complainant's plant for rate-making purposes which, in my opinion, the evidence satisfactorily sustains. This value assumed, and the other factors in the rate problem being practically undisputed, the following, set up on the record taken before the master, results:

| | | |
|---|---|---|
| Operating income ..................................... | | $548,477 |
| Operating expenses allowed by the master, less maintenance | $314,073 | |
| Maintenance (master's figure)............................ | 80,322 | |
| Depreciation allowed, 4 per cent. on $1,300,000............ | 52,000 | |
| Taxes excluding income taxes............................ | 29,000 | |
| | | $475,395 |

Deducting this sum from the operating income will leave a net return of $73,082, a return on the assumed value of $1,500,000 of approximately 5 per cent., which return is undoubtedly less than the law regards as fair, and requires, nothing else appearing, that the ordinance be enjoined.

It remains to inquire whether the operating expenses and maintenance allowed by the master were not excessive, and whether the additional evidence adduced before me, covering the period from July 1 to December 31, requires a different conclusion.

I find nothing in the additional evidence as to price trends and changes to cause a change in the figures taken by me for the value of the plant. On the contrary, the additional evidence but confirms my original view that the master, "in the exercise of a reasonable judgment, having its basis in a consideration of all the relevant facts," correctly arrived at his physical plant value, so that the factors in the problem of (1) depreciation reserve, and (2) rate of return, to which the plant is entitled, will be constant.

However, turning to the matter of operating return or revenue produced by the ordinance complained of, in the light of the additional evidence, I find that for the last six months since June 30, 1920, the property has been producing revenue at the rate of $618,000 per annum, as against the return of $548,477 which the master took as the basis of his report, and it at once becomes evident that, unless properly chargeable operating costs and maintenance have increased likewise, or the operating return for the six months ending December 30, 1921, are no fair criterion for the future, the earnings will be adequate to save the ordinance from the confiscation charge leveled against it, for, deducting the ascertained total of expenses, including the depreciation allowance, to wit, $475,595, used from the above, the estimated operating total for the fiscal year ending June 30, 1921, we have a net revenue of $142,405, or approximately 9½ per cent. of the valuation.

That this increase is not sporadic is evidenced by the fact that the property has been showing a steady increase in earnings; the 12

months ending December 30, 1920, showing a return of $581,418.33, as against $519,034.45 for the previous calendar year.

Turning first to the matter of operating expenses and maintenance set up by the company for the six months period ending December 31, 1920, we find a claimed six months operating expense of $205,-971, which, after deducting $29,500 for valuation expense, will produce on the same basis annually, a total of operating expenses and maintenance of $334,000, or an excess of $40,000 over the figures used by the master and taken by me in arriving at the assumed net return of $142,405 for the year ending June 30, 1921.

It will be noted that this assumes a maintenance charge of $12,000 in excess of the allowance by the master, and an operating charge of $28,000 in excess, notwithstanding the fact that as shown by the figures furnished by the company the largest labor and material increases occurred with them in 1918, and notwithstanding the further fact that index figures for 1918, when the maintenance charge was only $40,000, show an average of 196; for 1919, an average of 212; for 1920, an average of 248; and for December, 1920, an index figure of 189. In other words, while the maintenance for 1918 was $40,000, in which year, as stated by counsel for complainant and shown by the commodity indices, the rate of increase in the prices of material and labor was most rapid, and the maintenance for that part of 1919, before the rate litigation commenced, was $64,000, the maintenance for that portion of 1919 during which this rate controversy was at issue increased 100 per cent., with an increase in index figures of only 16 points, or less than 10 per cent., and the increase for 1920 was 136 per cent., with an increase over 1918 index costs of only 25 per cent.

It is plain, therefore, that the explanation of this increased maintenance upon the theory of increase over 1918 labor and material cost will not do, and the explanation for the continuing increase, in excess of the reasonable addition caused by increase in prices must be found in the fact that during the period of this enormous maintenance the investigation has been underway.

This is emphasized and made more certain by the fact that operating costs, once spent, are spent, and cannot go into the building and strengthening of the property, for though they have been subject to exactly the same increases, and in fact, perhaps, to larger increases than maintenance, since maintenance includes both material and labor, they have not increased in anything like the same ratio. I am therefore, in my opinion, not niggardly, but overliberal in allowing to the company for annual maintenance the sum of $70,000, a sum 75 per cent. in excess of its normal or average of $43,000 for the past 12 years from 1907 to 1918, inclusive, and more than 5 per cent. of the depreciable value of its property.

As to the operating costs, I think it clear that they are also excessive as a guide to the future, though, as I have stated above, nothing like as much so as was the case with maintenance. I shall not undertake to fix a definite figure for this operating cost, but find it sufficient for the purposes of this case, to note my view that no such increased expenses as here estimated will properly occur for the fiscal year ending

June 30, 1921, and that there is nothing in the operating and maintenance expense of the company to produce the view that, in the light of the actual earnings of the company, this case is so free from doubt as to authorize judicial interference with a legislative act.

I am not unmindful of the suggestion of counsel for complainant, supported by the statement of earnings, that the last six months of the year is ordinarily a larger earning period than the first six months, and that a better criterion for test purposes is the experience of a whole year rather than a half year.

To this suggestion it is sufficient to reply that, while this is true of operating returns, it is also true of operating expenses, and that, while I concur with complainant in the view that a part of the increased earnings for the six months period ending December 30 is due to the nature of the period under observation, it is undoubtedly true, as shown by the statements submitted by the company, that a larger part of this increase is caused by general, not seasonal increased earning power of the company. For, while it is true that the last six months of 1917 produced a greater revenue than the first six months of that same year, it is also true that the first six months of 1918 produced more than the last six months of 1917, that the first six months of 1919 produced more than the last six months of 1918, and that the first six months of 1920 produced within $5,000 as much as the last six months of 1919, so that while it is reasonably certain that the last six months will produce more than the first six months of the same year, it is as certain that the first six months of the year following will maintain the standard set by the last six months of the year preceding, and perhaps do somewhat better. This, together with the fact that the operating ratio, which has shown an abnormal increase through the years 1917, 1918, 1919, and 1920, will undoubtedly better itself in the coming year, not only through a slacking up in the rise of labor and material costs, but through the greater efficiency of labor, becoming increasingly evident in all lines, will more than counterbalance any error in allowing too large an influence to the six months experience ending December 30, 1920.

With this view it is not necessary for me to state whether the ordinance will, in my opinion, produce exactly 8 per cent., or a little more or a little short of it. It is enough to say that on the whole case I am not satisfied that the ordinance produces a return so plainly inadequate as to justify this court in interfering with the action of the municipality in the exercise of its rate-making function, and that the injunction prayed for will be denied upon a decree so drawn as to permit the complainant to again apply as it may be advised, should the actual experience of the future prove the prophecy false, and the municipality be derelict in extending the relief which, under the facts, it ought to grant.

### On Motion for Rehearing.

Complainants have filed a petition for rehearing, seeking to secure a reversal of certain of the positions taken by the court in the former opinion. The matters stressed in the motion are the court's treatment

of the items of grade raising, brokerage, depreciation, going concern value, operating expenses, and maintenance. On these points counsel for the complainant and the city have filed interesting and able briefs.

I have concluded that the motion is well taken on the matter of grade raising, and that that item should be allowed.

As to brokerage and going concern value, I adhere to my former ruling, and as to annual depreciation I find, after consulting the briefs of both parties, that I erred in the treatment of it in the main opinion, but that the error was as much against the city as against complainant.

## Grade Raising.

[10] In the original opinion in this case I stated:

"On the oral argument of this case, not correctly apprehending the nature of this allowance, and thinking it occupied the position of a fill or ordinary embankment, it was my impression that the master was correct."

I have returned to the opinion which I entertained on the oral argument, and will allow this item; it having been made to conclusively appear to me that this expense has nowhere been allowed here, nor does it appear in any other place in the valuation of the company's property.

I am also clearly of the opinion that there is nothing in the reproduction theory which, properly applied, requires the disallowance, nor is this in any true sense a case of property lost, demolished, or destroyed by storm.

There will therefore be added to the valuation of the property $142,-000 heretofore deducted by me on this score.

## Going Concern.

[11] Nothing in the briefs or arguments of the parties has caused me in any manner to change by opinion on this point; but, while a re-reading of my opinion on this feature leaves me in no doubt or uncertainty as to what was meant thereby, it is evident from the brief of complainant that the views of the court on this score have been misapprehended, since complainant treats the action of the court as a refusal to allow anything for going value. A few words on this score, in the light of the agreement of the engineers of the parties, may serve to make clear what the court intended to hold.

On October 11, 1920, the two engineers representing the litigants made an agreement in which they stated:

"The estimated undepreciated cost of reproduction of the railway property of said company on the historical basis, exclusive of franchise value, going concern value (development cost), bond discount, and brokerage fee, is $1,720,000 as of June 30, 1920. This estimate is made as nearly as possible on the basis of the prices which were in effect at the time of construction of the component elements of the property, except for lands and right of way, which are estimated at their present value.

"The above-stated estimate of $1,720,000 includes a total of $202,000 of overhead charges to cover the following items: Engineering and superintendence, law expenses, interest during construction, injuries and damages due to construction work, general expense and organization costs, but exclusive of bond discount and brokerage fee."

The master, in his disposition of the matter, headed his allowance "Development Cost." The court in the former opinion did not hold that the plant should not be valued differently because of its being a going concern, but, on the contrary, declared that there should be an allowance made for that fact. What the court did refuse to allow was the addition made to the plant's value by the master on the score of "development cost"; it being apparent from their stipulation that the engineers of the parties, in fixing the value which they did fix, had valued the plant as an operating, going entity, and had merely excluded from it that kind of going concern value which was expressed by the terms which they placed in parenthesis for definition, "development cost."

### Depreciation.

[12] In this matter it is plain, from the briefs of both sides, that the court has fallen into errors, both mathematical and otherwise, the first of which was in the failure, through oversight, to add to the depreciable items the $131,000 of depreciable property which have been added to the system since 1914. This amount should, of course, have been added to the total of the depreciables for the purpose of arriving at the annual amount.

In addition to this oversight, the court has erred in figuring the overheads into the amount on which the annual rate of depreciation should be allowed. The master, in appreciating the historical reproduction cost by $33\frac{1}{3}$ per cent., declined to allow any appreciation upon the overhead items other than engineering cost. This action was excepted to by complainants, and not only was this exception by the court sustained, but when the value of the depreciables was set up, for the purpose of arriving at the proper amount as depreciable annuity, the sum of the overheads was added in.

In its reply brief to the petition for rehearing the city vigorously attacks the action of the court as erroneous in both these particulars, and I have reached the conclusion that its position in part is well taken. I still adhere to the original views expressed, that in appreciating the property the amount of the overhead items should also be appreciated; but I think it entirely clear that the sum of the overheads should not appear at all in the depreciable property on which an annuity rate is figured. That the paradox involved in this statement is apparent, and not real, will, I think, appear upon the slightest reflection.

The record shows that the overheads, such as interest during construction, engineering, law expenses, etc., were arrived at by the parties by taking a certain percentage upon the estimated cost of the physical properties. It must necessarily follow, then, that, if the physical properties entering into the cost of the property are appreciated, the overhead items will be correspondingly increased, as the necessary result of applying the same percentage figures to the increased amount of money involved. Or, putting it otherwise, for the purpose of this calculation, the synthetic process is employed, and the overheads are not treated as distinct items, but as parts of a complete whole, and while I do not find that the items of overhead, such as interest during

construction, have appreciated in cost, or that, viewed as items apart from the physical property, there should be any appreciation applied to them, I do find that, when the base which is used to find the amount of these items by the application of percentage is increased, the sum of these items must necessarily itself increase.

On the other hand, when the matter of establishing the depreciation annuity is considered, the analytic process is employed, and the sum total of the value of the plant is resolved into its constituent items, so as to select those items making up the whole which are susceptible to depreciation. Under the influence of this process it is clear that the overhead items must be discarded in arriving at the annual depreciation allowance.

That this disposition is sound as to such items as interest during construction, organization expense, law expense, etc., admits of no doubt, because under no kind of theory could they be supposed to be subject to depreciation, and what doubt might arise with reference to the propriety of including engineering charges in these figures is at once dissipated when it is considered that the property will not be constructed again as an entirety, but is to be kept up by annual renewals from time to time made, so that engineering, and other such overheads caused by the assembling of the plant, will not have to be provided against, because they will not be again incurred.

In short, while, if the object of the depreciation annuity were to provide a fund sufficient at the end of a period of years to replace the plant as an entirety, the percentage ought to be figured on the entire cost of the plant, including the overheads necessarily incurred in assembling it, since the object is otherwise, and merely contemplates the provision of a fund out of which annual renewals and replacements can be made, none of these items ought to be considered in arriving at the annuity rate, for the same organization which runs the plant, the expense of which is provided for in the annual operating expenses, looks after, provides for, and takes care of the renewals.

The result of these views requires the complete rejection by the court of the figure of $1,300,000, taken in the original opinion as the basis for the 4 per cent. depreciation annuity, and the substitution therefor of the correct figure, $1,000,000, which is arrived at in accordance with these views, to which must be added $131,000 of new physical items overlooked by the court in the former opinion, making a total figure for the basis of depreciation allowance of $1,131,000.

## Maintenance.

[13] In the original opinion the excessive increases in maintenance over the year 1918 were disallowed by the court, and it was stated that an allowance of $70,000 on that score would be liberal. The arguments on the motion for rehearing have not changed, but have confirmed, that view.

While the data before the court did not permit of the absolute deduction, the court was of the opinion that the excessive advances in maintenance were explained by the fact that maintenance had been

confused with depreciation or replacement account, and that the shadowy difference between depreciation and maintenance, which exists in some classes of expenditure, had disappeared, with the result that the company was charging to maintenance items which ought to have been taken care of in replacement or depreciation account. I was led to this conclusion by the fact that, while maintenance costs were mounting higher and higher, the operating costs did not correspondingly increase.

Counsel for complainant lay the difficulty at the door of what they call "deferred maintenance," and claim that, unless they are now allowed a sufficient return to take care of this deferred maintenance, it must come out of the stockholders, which they claim is unjust. To this position the answer suggests itself that, as to maintenance and depreciation, in paraphrase of John Dryden, it may be said:

> "Maintenance is sure to depreciation near allied,
> And thin partition walls their bounds divide,"

and that if this maintenance has been deferred as much and as long as they claim, it has by this time become depreciation, and the total of the sums of deferred maintenance might with propriety be subtracted from the valuation of the property, because the money represented in those figures is either in the property or is not in it, and this valuation has assumed that the company's property was in proper repair.

I am inclined, however, to the view that the disposition of this item by deducting these sums from the capital value would not be accurate or just, and that the proper disposition of it is to treat it as what the company in fact claims it is, deferred maintenance, at least until such time as the company has had an opportunity to restore the property to its proper operative condition, by putting into it the "deferred" maintenance called for by their own figures.

Upon no view of it should the public be required to pay such rates as would permit the company, at the public's expense, to re-establish its property in the condition it ought to have been maintained in. The language of the Supreme Court in the Knoxville Water Co. Case has application here:

"If however, a company fails to perform this plain duty, and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon overissues of securities, or of omission to exact proper prices for the output, the fault is its own."

For there can be no difference between the effort to increase the *value of the property* through a recital of past failures to make replacements, and the effort to *increase the rate of return* in order to put back into the treasury moneys to take care of deferred maintenance. I am convinced, therefore, that, whether this excess maintenance is due to confusing maintenance with replacement cost, or to a condition of "deferred maintenance," the so-called "actual" maintenance expenditure cannot be allowed in determining whether the rate is confiscatory, but there should be taken an annual sum, arrived at upon a consideration of all the factors which enter into the problem, in the light of the history of the company, and in that light I have al-

lowed $70,000, which seems to me to be at present ample, and which, if prices continue to fall, will soon become itself excessive.

### Conclusion.

The effect of the altered views as above expressed requires the court to add to the actual figures of my first opinion, $1,483,780, which a rechecking of my calculations shows me is correct, $142,281 deducted for grade raising, giving a figure for the rate basis of $1,626,061, instead of $1,500,000 as used in the former opinion. It also requires that, instead of $1,300,000 taken in the former opinion as the value of the depreciables, there be taken for the basis of the depreciable annuity $1,131,000.

Neither these changes, however, nor any other matters called to my attention in connection with the motion for rehearing, require a change of view as to the disposition of the case, and the motion for rehearing will therefore, except as otherwise indicated herein, be overruled.