## RENO POWER, LIGHT & WATER CO. v. PUBLIC SERVICE COMMISSION OF NEVADA et al.

(District Court, D. Nevada. July 11, 1921.)

No. B–17.

1. **Waters and water courses** ⬡⟳203(10)—**Right to appropriate water from stream for sale is property right.**

Under the laws of Nevada, the right of a water company to divert water from natural streams for distribution and sale to consumers is a property right, the value of which it is entitled to have taken into consideration in the fixing of rates to be charged by it to its customers.

2. **Waters and water courses** ⬡⟳203(10)—**Basis of rates.**

Where rates to be charged by a water company are to be determined on the basis of enabling it to earn a fair return on the value of the property devoted to the service, the company must be charged at the same rate for water used for its own private purposes, and for that furnished to others under contracts by which it bound itself to furnish water at a lower rate as part consideration for property and water rights which it acquired, and on which it claims the right to earn dividends.

3. **Waters and water courses** ⬡⟳203(10)—**Company not entitled to credit for right to appropriate water which is wasted.**

Under the law of Nevada, that no person shall be permitted to divert or use the waters of the state, except at such times as the water is required for beneficial purposes, a water company is not entitled to the allowance for rate-making purposes of a value for the usufructuary right to water which is wasted.

4. **Waters and water courses** ⬡⟳203(12)—**Court without power to interfere with rates fixed by state commission, unless confiscatory.**

A court is without power to review, revise, or correct an order of a state public service commission, fixing rates to be charged by a water company, or to interfere with enforcement of such rates, unless they are plainly confiscatory.

5. **Waters and water courses** ⬡⟳203(12)—**Rates fixed by public service commission presumed reasonable and valid.**

Rates established by a state public service commission to be charged by a water company are presumed to be fair and reasonable, and the burden of proving the contrary rests on the party attacking them.

6. **Waters and water courses** ⬡⟳203(10)—**Company entitled to earn fair return on reasonable value of property.**

Rates which enable a water company to earn a fair return on the reasonable value of the property at the time being used for the public are reasonable and not confiscatory.

7. **Waters and water courses** ⬡⟳203(10)—**Valuation of property of water company.**

In determining the reasonableness of rates fixed for a water company, the original cost of its property, the amount expended in permanent improvements, the amount and market value of the company's bonds and stock, the present, as compared with the original, cost of construction, the sum required to meet operating expenses, and the probable earning capacity of the property under the particular rates prescribed are all elements to be considered.

8. **Waters and water courses** ⬡⟳203(10)—**Rates must be fixed with reference to reasonable period in future.**

The rule requiring the base value of the property of a water company, on which rates are calculated, to be reasonable, and the rate of return to be fair, means not merely fair and reasonable for the instant, but for some reasonable period in the future.

---

⬡⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. Waters and water courses ⊚⟩203(10)—All elements should be considered in valuation of property for rate purposes.

While reproduction cost at the time of inquiry is an important element to be considered in ascertaining the reasonable value of the property of a water company for rate-making purposes, it is not alone controlling, especially when at the time prices are abnormal, nor is any other one element determinative, but all should be given due consideration.

10. Waters and water courses ⊚⟩203(10)—Brokerage not an element of construction cost of plant.

In determining the reasonable value of the plant of a water company for rate-making purposes, brokerage is not a legitimate element of construction cost.

11. Waters and water courses ⊚⟩203(10)—Development costs or going concern value of water company.

A water company may not capitalize a deficiency in net income, below what would have been a fair return, in one year as development cost, or going concern value, on which it is entitled to earn fair returns in subsequent years.

12. Waters and water courses ⊚⟩203(12)—Valuation of property by state commission presumed correct.

The valuation of the property of a water company by a public service commission, as a basis for fixing rates, must be presumed to be a reasonable valuation, and the burden of showing the contrary rests on the party attacking the rates.

13. Waters and water courses ⊚⟩203(10)—Rates yielding net earnings of 7 per cent. not confiscatory.

Rates established for a water company by a public service commission, which enable the company to make net earnings of 7 per cent., will not be held confiscatory.

In Equity. Suit by the Reno Power, Light & Water Company against the Public Service Commission of Nevada, J. F. Shaughnessy and others, as members of said commission, Leonard B. Fowler, Attorney General of Nevada, and Lester D. Summerfield, District Attorney of the County of Washoe. Decree for defendants.

Cheney, Downer, Price & Hawkins and Hoyt, Norcross, Thatcher, Woodburn & Henley, all of Reno, Nev., for plaintiff.

Leonard B. Fowler, Atty. Gen., and Robert Richards, Deputy Atty. Gen., for defendants.

FARRINGTON, District Judge. The Reno Power, Light & Water Company has filed its bill, asking an injunction to restrain the enforcement of an order made by the Public Service Commission of Nevada, fixing a schedule of rates and charges for water to be supplied by the company to the people of Reno and Sparks, and to farmers in the vicinity. The order was dated July 29, 1920. March 16th of the same year the company filed with the commission a schedule of rates, to become effective May 1, 1920, which contemplated an annual gross revenue of $150,417. For a number of years prior to May 1st, rates voluntarily put into effect and maintained by the company had yielded a gross revenue, increasing from $89,150.50 in 1911, to $114,536 in 1919. It was estimated by the commission that the gross revenue for the year 1920, under the same rates, would be $117,136. The schedule promulgated by the commission was designed to produce a return of $136,500,

$19,364 more than the estimated income for 1920 if the old rates were maintained, and $14,041 less than the estimated income for that year if the rates proposed by the company were enforced. The company complains that the rates provided for by the commission's schedule of July are confiscatory.

It is alleged in the bill that for more than 10 years complainant has been engaged in selling and distributing water for hire to the inhabitants of Reno, Sparks, and vicinity; that its property devoted to that purpose, used and useful therefor, exclusive of water rights, is worth more than $1,500,000; that for more than 10 years it has been the owner of the right to divert, sell, and distribute 75 cubic feet per second of water from Truckee river and Hunter creek, and has been continually and actually exercising this right; that the right is now the property of plaintiff, and is worth more than $150,000, exclusive of the value of plaintiff's canals, reservoirs, and other property. It is further alleged that under the water company's schedule, filed March 16, 1920, its gross operating revenue will not exceed $153,000, its operating expenses, costs, and taxes are in excess of $63,000, and the actual depreciation of its plant and equipment, exclusive of water rights, is in excess of 2 per cent. per annum, by reason of which it is entitled to a depreciation annuity of $32,000.

Referring to the schedule of rates fixed by the commission, complainant avers that, after deducting operating expenses, taxes, and a fair and proper depreciation annuity, its net revenue will not exceed $57,000; that 8 per cent. per annum is the current rate of interest for secured loans on residence and business property in the vicinity, and that 12 per cent. is the lowest rate sought and generally obtained as a return on capital invested in banking, merchandise, and other business in Reno and Sparks; that the net return of plaintiff on its property, if the rates prescribed by the commission prevail, will be less than 3½ per cent. per annum. Plaintiff further alleges the commission has valued the property, which, exclusive of water rights, is worth $1,500,000, at about $800,000, and has failed to allow any value whatever for its water rights, which are worth more than $150,000.

### Water Rights.

[1] I am of opinion that a failure to allow a corporation engaged in diverting water from a natural stream in this state for distribution and sale a fair return upon the fair value of the right of diversion, sale, and distribution is a mistake. Section 4674, Rev. Laws Nev. 1912, declares:

There is no absolute property in the waters of a natural watercourse or natural lake. No right can be acquired to such waters, *except an usufructuary right—the right to use it, or to dispose of its use for a beneficial purpose.*" (Emphasis is mine.)

This provision was adopted March 16, 1899. St. Nev. 1899, p. 115. The same language appeared in the Act of February 26, 1907. St. Nev. p. 30, § 3. That act was amended February 20, 1909 (St. Nev. 1909, p. 31), but without affecting the provision quoted. March 22, 1913 (St. Nev. 1913, pp. 192, 219), the Acts of February 26, 1907, and

February 20, 1909, were repealed. After declaring in section 4, p. 192, that:

"All water used in this state for beneficial purposes shall remain appurtenant to the place of use: Provided, that if for any reason it should at any time become impracticable to beneficially or economically use water at the place to which it is appurtenant, said right may be severed from such place of use and simultaneously transferred and become appurtenant to other place or places of use, in the manner provided in this act, and not otherwise, without losing priority of right heretofore established,"

—the repealing act provides:

"That the provisions of this section shall not apply in cases of ditch or canal companies which have appropriated water for diversion and transmission to the lands of private persons at an annual charge."

'It is difficult to understand this language, and especially that in the Act of March 16, 1899, otherwise than as a legislative recognition of the right to appropriate water for the purpose of distribution and sale. The power of the state to authorize such appropriation of water cannot be disputed. 2 Kinney on Irrigation, § 703. It does not appear when the water rights claimed by plaintiff were appropriated, but from the pleadings it is evident they have been enjoyed for more than 10 years, and therefore must have been acquired prior to the Act of March 22, 1913, and undoubtedly were used continuously during a considerable period while section 3 of that act was in full force and effect. In section 2 of the same act rights then existing were preserved.

After reading in this connection section 4674, quoted above, the question naturally arises: Why should one be permitted to appropriate water to be disposed of for a beneficial use, if he thereby acquires no water to be disposed of? If on taking a customer and supplying him with water, which he applies to a beneficial use, the water right and the power of disposal vest exclusively in such customer, why is it provided that the water so used does not remain "appurtenant to the place of use, when the water has been appropriated by a company for diversion and transmission to the lands of private persons, at an annual charge"? The theory that the right vests exclusively in the customer is illogical under a statute which declares that his use of the water is not appurtenant to the land on which he uses it. The proviso was added for the protection of some right owned and enjoyed by the company diverting and disposing of the water. If the customer refuses to pay the annual charge, and if the use of the water is not appurtenant to his land, the inference is that the company may dispose of it to some one else, who will pay. The proviso was undoubtedly inserted in view, among other things, of the possibility that without it some or all of the customers, on the theory they owned the water right, might refuse to pay the annual charge therefor, and at the same time insist that the use of the water is appurtenant to their lands, insist on their power to dispose of the water right, possibly to some rival company, or to divert the water from the natural stream through their own ditches, and to that extent render the ditches, dams, and reservoirs of the company useless.

By diverting the water of a natural stream, and by applying it to a beneficial use, a water company secures a right prior to rights acquired

by subsequent diversions. A bona fide customer of the company receives, not only the service of the company, but also an interest in such priority proportionate to the amount of water beneficially used by him. He also has a prior right to purchase, and to compel delivery to himself of, such water as he has been accustomed to receive in preference to any other customer, whose initial purchase and use from the company commenced at a later date than his, and these rights continue as long as he pays the reasonable charges of the company, and conforms to its reasonable regulations, but do not extinguish such rights as the company had acquired for the beneficial purpose of supplying the needs of customers. Prosole v. Steamboat Canal Co., 37 Nev. 154–156, 163, 140 Pac. 720, 144 Pac. 744.

In San Joaquin, etc., Co. v. Stanislaus County, 233 U. S. 454, 34 Sup. Ct. 652, 58 L. Ed. 1041, boards of supervisors of Stanislaus, Fresno, and Merced counties, Cal., in establishing water rates to be charged by the irrigation company, declined to consider the company had any water right which could be taken into account in determining the value of its plant. This position was approved by the Circuit Court (191 Fed. 875), and the company's bill to restrain the enforcement of the orders adopted by the supervisors was accordingly dismissed. In the Supreme Court of the United States it was contended that the company was not entitled to have its alleged water rights valued in a proceeding to fix rates, because under the Constitution of the state of California it had dedicated its waters and water rights to a public use; it was a mere purveyor or carrier of water, and the public served by the complainant was the owner of the water rights. The Supreme Court said the company had the sole right to furnish the water; the owner of the irrigated lands could not get it except through the company's help, and it would be unjust not to take that fact into account in fixing rates; though the water appropriated was appropriated for a public use, it was not for the use of all the public, but for the few within reach of the supply, who could demand it for a reasonable price. It was unreasonable to suppose that the Constitution meant, if one who appropriates water, instead of using it on his own land, distributes it to others, he thereby loses the rights lawfully acquired. "It is unreasonable," said the court, "to suppose that the constitutional declaration meant to compel a gift from the former owner to the users and that in dealing with water 'appropriated for sale' it meant that there should be nothing to sell." The decree of the Circuit Court was reversed.

In Murray v. Pub. Util. Com., 27 Idaho, 603, 150 Pac. 47, it was held the Idaho commission erred, in that it failed in determining the value of the Pocatello Water Company's plant as a basis for fixing rates, to include the value of the water right. "If," said the court, "one appropriates water for a beneficial use, and then sells, rents, or distributes it to others, who apply it to such beneficial use, he has a valuable right which is entitled to protection as a property right. * * * To be sure, the person who takes water from the water company or carrier also acquires a right to the use of it, dependent upon user and payment, but this does not alter the fact that the water company has a right."

I am aware the courts of Colorado, notably in Pioneer Irr. Co. v. Bd. of Com'rs (D. C.) 236 Fed. 790, 792, have held that "the owner of

the carrying ditch, in making the diversion from the natural stream, acts solely as the agent or trustee for him who applies the water to a beneficial use," and gets no title in or right to the use of the water, and has no property in it subject to disposal, but that such property and right of disposal is in him who applies the water to a beneficial use. Judge Lewis, who decided that case, thus explains why he declined to follow the rule in the San Joaquin Case, supra:

"The Constitution and statutes of California empowered the carrying company in that case to appropriate water for sale, and in the exercise of the right thus given it acquired for that purpose some of the water by mere diversion from the natural stream and purchased some of it. A carrying ditch in Colorado is not given such power and cannot acquire such rights as a carrying ditch."

In Prosole v. Steamboat Canal Co., 37 Nev. 154, 140 Pac. 720, 144 Pac. 744, there are to be found some observations apparently in line with the Colorado doctrine; but the Nevada court had under consideration issues growing out of the circumstance that the canal company had refused to deliver to a customer his usual 50 inches of water, though he had offered to pay the charge therefor. The customer's claim was upheld; but whether the company had a property interest in the right to furnish the water the court declared was not an issue in the case, and its remarks in the opinion on that subject were not to be considered as decisive.

While the reasonable value of the water right, in so far as it is used and useful in supplying plaintiff's customers, is a part of the total value on which plaintiff is entitled to a fair return; and while it is practically admitted in the answer that the use of the 75 second feet of water claimed by plaintiff is worth substantially $150,000, the evidence produced by plaintiff itself raises a few questions in this connection which demand consideration. Of the 75 second feet so claimed, according to Gillette's report of 1917 (pages 82, 83, and 84), 60 second feet are taken from Truckee river and 10 from Hunter creek. Of the total 70 second feet thus taken, 20 second feet during the irrigating season, or an average of 15 second feet throughout the year, are distributed to the people of Sparks and Reno, and 23 second feet to irrigators. There is a seepage loss of 12 cubic feet per second in the Highland ditch, and quite commonly a waste of 15 cubic feet per second at the spillways. If the seepage loss be regarded as unavoidable, there are still, of the 75 cubic feet per second claimed, 20 which are either not taken from the river or returned to it. Other testimony shows that, during the irrigating season, 1,061 inches, or 26½ second feet, are delivered to irrigators.

Plaintiff's records show that during the year 1919, 3,663,934,976 gallons of water were delivered to the reservoirs supplying Reno and Sparks. That amount of water is equivalent to a flow of 15.5 cubic feet per second. Of this last amount about 1.5 cubic feet per second is sold and delivered to the Southern Pacific Company, and about 4 cubic feet per second is wasted in some 450 toilets through which water is permitted to flow constantly. For this waste the users of such toilets are primarily responsible, but the initiative in stopping the waste

is probably with the company. The flow of water beneficially used by the people of Reno and Sparks thus averages about 10 cubic feet per second. The average amount of water supplied by the company to all its customers, including itself, and 12 cubic feet per second for seepage, having regard to the fact that the irrigating season is but five months in length, is equivalent to an average annual flow of 38.5 cubic feet per second.

The following table, though only approximately correct, shows the prices per cubic second foot for water, and the estimated gross revenue under each of the three schedules for each class of consumption:

| | Amount Used in Gallons or Inches. | In Second Feet. | Estimated Collections under Old Schedule. | Rate per Second Feet. | Estimated Collections under Schedule Demanded by Company. | Rate per Second Feet. | Estimated Collections under Commission's Schedule | Rate per Second Feet. |
|---|---|---|---|---|---|---|---|---|
| Customers in Reno and Sparks (other than S. P. Co. and fire hydrants.) | | 14. | $100,177 | $7,584 | $136,552 | $9,753 | $123,870 | $8,705 |
| S. P. Co. | 1,000,000 gals. per day | 1.5 | 3,600 | 2,400 | 3,600 | 2,400 | 6,000 | 4,000 |
| Irrigators (other than Clow & Evans and Reno P. L. & W. Co.) | 761 inches | 19. | 4,566 | 240 | 9,605 | 560 | 5,840 | 320 |
| Clow & Evans | 280 inches. | 7. | 560 | 80 | 560 | 80 | 560 | 80 |
| Reno P. L. & W. Co. | 20 inches | .5 | | | | | | |
| Spillway | | 15. | | | | | | |
| Seepage | | 12. | | | | | | |
| Not taken from river. | | 6. | | | | | | |
| Total | | 75. | | | | | | |

The foregoing table shows that irrigators supplied by the company during the irrigating season of 1919 used 1,061 miner's inches of water, of which 20 inches were used on the company's own lands, 280 were delivered to Clow & Evans at the rate of $2 per inch, or $80 per second foot, and 761 inches, or 19 cubic feet per second, to other customers at the rate of $6 per inch, or $240 per second foot. The schedule demanded by the company contemplates raising the $6 per inch rate for irrigators to $14, or $560 per second foot. No suggestion is made that the $2 per inch rate to Clow & Evans should be advanced, or that the company should pay for the 20 inches used in the irrigation of its own lands.

[2] It is suggested in the argument that the reduced rate extended to Clow & Evans was a part of the consideration for the Highland ditch, or for some other property acquired from them. Putting aside all question as to the validity of the contract as between the parties thereto, it is proper to say that the public cannot be required to pay rates based on the present fair value of the plant, and at the same time pay in addition rates which will enable the company to meet the cost of acquiring its property. This is requiring the consumer to buy the property for the company and also to pay the company for its use. The difference between what the company receives from Clow & Evans and what it would receive, if they were charged as other irrigators, should be accounted for, and the same may be said as to the water used by the company on its own lands. Under the commission's schedule, the revenue of the company from this source should be $2,400 per annum, instead of $560. The existence of a contract binding the company "for all time to come" to the extent of its rights "in the waters of Truckee river," to deliver to Clow & Evans 200 inches, or 5 cubic feet per second, during each and every irrigating season, at and for the price of $2 per inch, or $80 per second foot, subject only to a prior right of 100 inches, or 2½ second feet, is a circumstance materially affecting the value of the Highland ditch and the water rights involved in this suit.

[3] In a land where water is so scarce, so valuable, and so much in demand as in Western Nevada, it is unjust and unreasonable to allow for rate-making purposes a value for the usufructuary right to water which is wasted. I am not overlooking the rule that a public utility company is entitled to a value, not only on property in actual use, but on that which presently will be necessary to serve the growing needs of the public; but it is the law of Nevada that, when the necessity for the use of water does not exist, the right to divert it ceases, and no person shall be permitted to divert or use the waters of this state, except at such times as the water is required for a beneficial purpose. Furthermore, it is, and always has been, against public policy in this state to permit any waste of water. There is no showing that the company has made any effort to find even a temporary beneficial use for its waste water. The court can take judicial knowledge of the fact that there is a constant and growing need for water in Western Nevada, and usually an insufficient supply during the irrigating season. In 1911 Reno and Sparks used 14.3 cubic feet per second; in 1914, 16 second feet; and in 1919, 15.5 second feet, of which 4 second feet were wasted. The average for the 10 years preceding 1920 was 15.27 second feet. There is no apparent necessity for holding nearly one-third of these water rights in idleness in order to supply needs which probably will only arise in a distant and more or less uncertain future.

## Reasonable Value.

Relative to the alleged valuation of plaintiff's property defendants' answer is as follows:

"Deny that in truth or in fact the value of the property of plaintiff devoted to said public service has been for many or any years last past, or is now, in excess of $1.500,000, exclusive of any value for water rights, and in this connection defendants allege that the value thereof is the sum of approxi-

mately $800,000, and except that defendants allege that they have no information or belief sufficient to enable them to answer the allegation relating to the value of the water rights of the plaintiff, and basing their denial upon such ground, defendants deny that the value of the water rights of the plaintiff are now and for many years last past have been in excess of $150,000, or are now or ever have been of any other value whatever for fixing or determining the rates referred to in the bill of complaint, and deny that said Public Service Commission of Nevada in arriving at a valuation of plaintiff's property failed or neglected or refused to allow any value to or for the alleged water rights of plaintiff referred to in the bill of complaint, and is this connection allege that the value thereof was given due consideration and weight by said commission as the same applied to or affected the property and assets of plaintiff as a going and continuing public utility and as a going and continuing business concern."

[4] It was within the province of the commission to prescribe a schedule of rates. This power necessarily implied on the part of the commission a right to exercise a certain range of discretion, and so long as this discretion was kept within the authority conferred by the Legislature, and the rates fixed are not so low as to violate the company's property rights under the Constitution, it was and is the duty of this court to refrain from interference with the rates adopted. It has no power to review, revise, or correct the order fixing rates. It has no authority to substitute its judgment for that of the commission, and it cannot interfere with the collection of the rates complained of, "unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to taking property for public use without such compensation as under all circumstances is both just to the company and to the public." Louisville & Nashville R. R. Co. v. Garrett, 231 U. S. 298, 312, 34 Sup. Ct. 48, 58 L. Ed. 229; Minnesota Rate Cases, 230 U. S. 352, 433, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Spring Valley Water Co. v. San Francisco (C. C.) 165 Fed. 667, 682; San Diego Land Co. v. National City, 174 U. S. 739, 753, 19 Sup. Ct. 804, 43 L. Ed. 1154.

[5, 6] The rates established by the commission are presumed to be fair and reasonable, and the burden of proving the contrary is on the party attacking them. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Railroad Com. v. Cumberland Tel. Co., 212 U. S. 414, 29 Sup. Ct. 357, 53 L. Ed. 577; Spring Valley Waterworks v. San Francisco (C. C.) 192 Fed. 137, 144. In the Willcox Case the decree of the lower court was reversed, with direction to dismiss the bill because the Gas Company had "failed to sustain the burden cast upon it of showing beyond just or fair doubt that the acts" complained of were in fact confiscatory. "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; Minnesota Rate Cases, 230 U. S. 352, 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; San Diego L. & T. Co. v. Jasper, 189 U. S. 430, 442, 23 Sup. Ct. 571, 47 L. Ed. 892.

[7] In order to ascertain such reasonable value:

"The original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property."

This is the broad scope which the inquiry should take, according to the view of the Supreme Court of the United States, as expressed in the Smyth-Ames Case, 169 U. S. 466, 526, 546, 18 Sup. Ct. 418, 42 L. Ed. 819. Every conceivable element and circumstance which constitutes value, or tends to increase or decrease the value of the plant, must be given proper consideration by the appraisers. Among such circumstances are present prices and wages, and any facts tending to show whether such prices and wages are likely to continue, and to what extent, if any, they are inflated by temporary and passing conditions. It is significant that, in practically every statement of this rule, value is qualified by the adjectives fair or reasonable. Neither original cost, reproduction cost, reproduction cost less depreciation, market value of the stock and bonds, or any other single circumstance is necessarily controlling or equivalent to reasonable value.

True, in many cases the courts have approved the reproduction cost less depreciation method, but we must not lose sight of the fact that it is only one of the guides in the quest for reasonable value. In times when prices and the value of money and property are stable, it is frequently the best and most reliable index of reasonable present value; but in times of abnormally high or unusually low prices, a condition which in its nature must be temporary, the then reproduction cost would be unjust to the owners of the utility or to the public which it serves. In times of inflated prices, the prudent man hesitates to invest because he fears the building he erects or the plant he buys will cost more than it is worth. Utility and nonutility property are protected by the same constitutional guaranties. Neither can be taken for public use without just compensation. If the sole measure of reasonable value is reproduction cost at present prices less depreciation, it logically follows, if the owner in a condemnation proceeding is awarded less, then to the extent of the difference his property has been confiscated. The courts, however, have consistently and uniformly decided that all the owner is entitled to receive is the price which a willing purchaser who is not compelled to purchase would pay to one who is willing but not compelled to sell.

Manifestly there is no market for public utility properties. They are rarely sold. They have no ascertainable market value. The income of such concerns is subject to regulation. If wisely conceived and prudently constructed, they should be worth more than actual cost. No single method of appraising the value of such property has yet been found which is entirely satisfactory. Effort is usually made to employ the reproduction cost method as a formula, but each person who engages in the solution of the problem quickly finds no formula is possible; his

way is beset with uncertainties at every step. Few of the factors with which he has to deal are either constant or certain, and finally, when a result is reached, it usually must be modified by subtracting some amount, large or small, according to the judgment of the appraiser, for depreciation, or by arbitrarily adding for development cost, contingencies, and the like, so that the final result may be approved on the whole as reasonable.

If the value of the property and the rates are to be adjusted to the prices of to-day, they should be readjusted to-morrow to suit to-morrow's prices. If the monetary value of this property be increased, because the purchasing power of the dollar has decreased, the same reasoning is equally cogent when applied to the $750,000 loaned this company to acquire its property, and in that event are the bondholders not equitably entitled to a similar raise in the face value of their bonds? Any business operated on a small margin of profit, and dependent to any considerable extent on the services or the materials supplied by a public utility, is rendered more uncertain, more hazardous, and less likely to be profitable, if rates are changed with every rise or fall in the purchasing power of the dollar, or in wages, or in the price of wool, cotton, coal, oil, or iron. The confusion and expense resulting from frequent changes in utility rates would be intolerable. The common prosperity is best promoted by stable rates, and by the elimination of uncertain and speculative conditions. When property is devoted to public service, the owner must realize that it is subject to regulation, primarily for the public welfare. He is entitled to a just return, but in any event his return must be just to the public. This is the condition under which he enters the business. What the public welfare and industry in general demand is the greatest stability in rates which is consistent with justice to the utility. Hence, if a rate is fixed by the rate-making body, it should not be for one day or for one month, but with the idea of covering justly fluctuations for as long a period as possible. A rate-making body should provide, not for the past or merely for the present, but for the future.

The high prices of January 1, 1920, were due to inflation of the currency, and to the fact that so much capital and so many men had been transferred from productive industry to the business of destruction. But for months past both capital and labor have been seeking employment in productive industries. Inflated prices in the very nature of things are transitory. Inflation cannot be uniform, and it is the law of prices, as it is of water, to seek a level. The very fact that the price of a commodity is abnormal sets in operation economic forces tending to its reduction. That the price of raw materials has fallen in some instances to pre-war levels, and that the trend of wages and prices in general is downward, is a matter of which judicial knowledge may be taken.

[8] I conclude that the rule requiring the base value on which rates are calculated to be reasonable, and the rate of return to be fair, is economically sound; and this, I take it, means not merely fair and reasonable for the instant, but for some reasonable period in the immediate future. Few cases can be found in which it is held that, in

fixing reasonable value, reproduction cost is the sole determining factor.

[**9**] In Consolidated Gas Co. v. New York (C. C.) 157 Fed. 849, 855, Judge Hough says that reproduction value at the time of the inquiry is the first and most important figure to be ascertained. He does not say, however, that it is controlling, that a result obtained by that method is equivalent to reasonable value, or that in every case or at all times it is the most satisfactory guide. When he made the statement, he was arguing that reproduction cost in the case then under investigation was a more reliable measure of reasonable present value than original cost. That decision was rendered in 1907.

In Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 168, 35 Sup. Ct. 811, 59 L. Ed. 1244; Id. (D. C.) 199 Fed. 204; Denver v Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649; Brunswick Water Dist. v. Maine Water Co., 99 Me. 371, 377, 59 Atl. 537; Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Id. (C. C.) 184 Fed. 765; and Murray v. Pub. Util. Com., 27 Idaho, 603, 150 Pac. 47 —all cited by plaintiff, the rates complained of were adopted, and suits to test them brought, before or about the beginning of the European War; hence utility property values based on war-inflated prices were not squarely and directly before the court for investigation or decision. I fail to find in any one of them any indication of a purpose to restrict reasonable value to a value obtained by application of such prices only as are prevailing at the very time of the inquiry. The attitude of the Supreme Court is disclosed in the Minnesota Rate Cases, 230 U. S. 352 (33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), where at page 434 it is said that:

"The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relative facts."

Lincoln Gas & Elec. Co. v. City of Lincoln, 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968, was commenced in 1906 to restrain the enforcement of an ordinance of that year regulating gas rates. By decree rendered in 1915 the ordinance and the rates were sustained, and the gas company's bill dismissed. June 2, 1919, this disposition of the issues was approved by the Supreme Court of the United States, but the decree was modified, so as to permit the complainant, if it could, to show—

"as a result of its practical test of the dollar rate since May 1, 1915, or upon evidence respecting values, costs of operation, and the current rates of return upon capital as they stand at the time of bringing suit and *are likely to continue thereafter*, that the rate ordinance is confiscatory in its effect under the new conditions." (The emphasis is mine.)

The court then added:

"It is a matter of common knowledge that, owing principally to the World War, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted, and largely since this cause was last heard in the court below. And it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future."

It was unnecessary to consider the effect of war-inflated prices on an ordinance adopted in 1906 in a suit brought in that year. The dedecree was proper, because the company had failed to prove that under the rates provided by the ordinance it was not receiving a fair return on the then reasonable value of its property. But as the valuation and the return thereon, which were fair in 1906, under the changed conditions produced by the war might not be fair, or even fair criterions, for the future, the dismissal was without prejudice. There is nothing in the decision modifying the doctrine that what a public utility corporation is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of its property at the time it is being used for the public. There is no logical connection between that doctrine and the proposition that what the company is entitled to demand is a rate of return equal to current rates of interest in the vicinity on what it will cost to reproduce the property new at prices, whether high or low, prevailing at the time of the inquiry.

Attention has been called to the "entire absence" of the words "normal" and "abnormal" in the decision, but the thought is expressed in the suggestion that, if another suit is brought to test the ordinance, evidence should be produced "respecting values, costs of operation, and the current rates of return as they stand *at the time of bringing suit and are likely to continue thereafter.*" How does the idea of "values as they stand and are likely to continue" comport with the contention that the value of complainant's plant must be determined by the reproduction method, applying prices of January 1, 1920, exclusively? Such prices can have a preponderating influence only when it is established by the evidence that they are likely to continue.

National Waterworks Co. v. Kansas City, 62 Fed. 853, 866, 10 C. C. A. 653, 27 L. R. A. 827, was a suit in relation to a contract for the construction of waterworks, and the price at which the plant should be taken by the city was in issue. Mr. Justice Brewer, in expressing the views of the Circuit Court of Appeals, said:

"There is a large amount of testimony as to the probable cost of reproducing the system, to which strenuous objection is made on the ground of an alleged temporary and extreme depression in the cost of labor and material. * * * We have the fact of liens placed upon the property, to the extent of $3.000.000, with the qualified approval of the city officials. We have also the statement of the earnings, and the estimate of the value upon the basis of a capitalization of those earnings, amounting, as stated, at 6 per cent., to $4,500,000. Rejecting the latter as too high, and the cost of reproduction as too low, and taking into consideration the entire history of the transactions between the company and the city, * * * we have sought to place a value upon the property as it stands. * * * That valuation, after much discussion, comparison of figures, and readjustments, we have all agreed is $3,000,000. Our effort has been to deduce from the volume of testimony that which * * * can be safely adjudged 'the fair and equitable value.'"

In Municipal Gas Co. of Albany v. Pub. Service Com. of New York, 225 N. Y. 89, 121 N. E. 772, P. U. R. 1919C, 364, it was alleged in the bill conditions had so changed that rates prescribed in 1907 had become relatively so low as to be confiscatory in 1918, that the cost of materials and labor had risen with the war, that these conditions would continue, and that there was no prospect of any decrease in such costs.

The lower court sustained a demurrer to the bill and dismissed the case. The appellate court very properly reversed the decree, saying that the case must go to trial on its merits; that the alleged deficiency in plaintiff's income when "analyzed may be dissolved, the conditions engendered by the war may linger for months or years, or may vanish with the coming of peace; these are questions for the trial." The plain implication is that the weight to be given high prices in estimating reasonable value depends upon whether they are likely to continue. In that case it was alleged that prices were high, that they would continue, and that there was no prospect of any decrease. Under such allegations the high prices were important in determining present reasonable value.

In St. Joseph Ry., Light, H. & P. Co. v. Pub. Service Com. (D. C.) 268 Fed. 267, the company's valuation was based on present-day reproduction cost, without depreciation. The commission rejected this, and took instead original cost when obtainable; when not, it relied on average prices for a fixed period of five years before war prices prevailed. The rates complained of were adopted in November, 1919. The court said that present fair value is the object to be attained, that it was not permissible to restrict the inquiry to a period antedating present war prices, and that a return of 5.4 per cent., which would be earned under the rates fixed by the commission, was not generally regarded by courts or commissions as reasonable. The method of valuation employed by the commission was held to be wrong.

In Landon v. Court of Industrial Relations (C. C.) 269 Fed. 433, 444, valuation was based on original cost. It is needless to say that original cost has never been regarded as a reliable criterion by the federal courts. The court said:

"Cost of reproduction new, at the present time and at prevailing prices, should not be rejected, but carefully considered, together with the other elements, in reaching a 'reasonable judgment, having its basis in a proper consideration of all relevant facts.'"

In Galveston Elec. Co. v. City of Galveston (D. C.) 272 Fed. 147, 154, in submitting the case, the parties agreed that the property had cost $1,715,825. Complainant contended that this figure should be appreciated by a sufficient percentage to actually conform it to present-day value. The city argued that the agreed cost of the plant, less accrued depreciation, should be taken as the basis of value for rate-making purposes; that "these were unusual times, and such appreciation as existed was abnormal and fugitive, and not a proper basis for rate-making." The court said:

"The estimates of excess percentages over the values taken in the agreed statement ran as high as 110 per cent. The position of defendants' witnesses was that the price trends were rapidly toward a pre-war basis; of the complainant, that those trends would settle to a present price level of about 66 per cent. above the basis taken for the agreed figure. It was the master's view, under all the circumstances, that it ought to be determined by him that 33⅓ per cent. was a normal standard for appreciating the agreed values, and this percentage he adopted. Though both complainant and defendants vigorously attack this finding, I shall confirm it, because I believe that it has been arrived at in the exercise of a 'reasonable judgment, having its basis in a proper consideration of all relevant facts.' Nothing, however, in any of these views, leads me to believe that a permanently lower price level

may reasonably be reached for some time to come than the one taken by the master of 33⅓ per cent., and his finding on this point will therefore be adopted by me without change."

The decision in the Minnesota Rate Cases, supra, was written by Mr. Justice Hughes. In 1918, as referee, he decided the Brooklyn Borough Gas Company Case, reported in P. U. R. 1918F, 335, 347. In the course of this decision he uses the following language:

"While it is important to consider the cost of reproduction in determining the fair value of a plant for rate-making purposes, it cannot be said that there is a constitutional right to have the rates of a public service corporation based upon the estimated cost of the reproduction of its property at a particular time regardless of circumstances. To base rates upon a plant valuation simply representing a hypothetical cost of reproduction at a time of abnormally high prices due to exceptional conditions would be manifestly unfair to the public, and likewise to base rates upon an estimated cost of reproduction far lower than the actual bona fide and prudent investment because of abnormally low prices would be unfair to the company. This question of taking the hypothetical reproduction cost under abnormal conditions as a rate base should, of course, not be confused with the necessity of recognizing actual costs of operation even though abnormal. A public service corporation is entitled to be reasonably compensated for its service, and the actual cost of its operations must always be taken into consideration in determining whether or not it receives a fair compensation above that cost. But it is a different thing, after cost has been defrayed, and the question is as to the compensation to be allowed in excess of cost, to take as the basis for a compensatory return an asserted plant value, far above the actual investment, which is reached merely by expert estimates of a cost of reproduction under abnormal conditions. This would result in allowing a public service corporation to take advantage of a public calamity by increasing its rates above what would be a liberal return not only on actual investment, but upon a normal reproduction cost, in the view that unless it could make an essentially exorbitant demand upon the public it would be deprived of its property without due process of law. * * * If, however, we are not to take the actual cost of reproduction at the present time, or within a year or so, because it would be an abnormal cost, and we are to seek some fairer basis of estimating the value of plaintiff's property for the purpose of determining the validity of rates, it would be difficult to find any basis more just than the appraisal carefully made by public authority and based on reproduction cost before the outbreak of the European war, with proper consideration of the actual investments since that time."

The rule as laid down by Mr. Hughes in the above case has been approved frequently. In re West Virginia Water & E. Co., P. U. R. 1920D, 409, 415; In re La Porte Gas & Elec. Co. (Ind.) P. U. R. 1920F, 586, 593; In re Colonial Power & L. Co. (Vt.) P. U. R. 1920A, 215, 218; Holland v. McGuire (Mich.) P. U. R. 1920B, 149, 164; In re Central Union Telephone Co. (Ind.) P. U. R. 1920B, 813, 825; Potomac El. P. Co. v. Pub. Util. Com., P. U. R. 1920C, 326, 341; Whitehead v. Niagara Falls Gas & E. L. Co., P. U. R. 1920C, 264; Davis v. Pennsylvania Gas Co. (N. Y.) P. U. R. 1921B, 342, 358; Ft. Wayne v. Home T. & T. Co. (Ind.) P. U. R. 1920D, 83; New York Interurban Water Co. v. Mt. Vernon, 110 Misc. Rep. 281, 180 N. Y. Supp. 304, P. U. R. 1920D, 515, 519; In re York County Water Co. (Me.) P. U. R. 1921A, 439, 441; In re Lewiston Gaslight Co. (Me.) P. U. R. 1921A, 561, 569; In re Omaha & C. B. Street Ry. Co. (Neb.) P. U. R. 1919A, 845, 849; In re Southwestern Bell Telephone Co. (Mo.) P. U. R.

1919B, 422; In re Utah Light & Trac. Co., P. U. R. 1920B, 262, 270; In re Union Gas & Elec. Co. (Ohio) P. U. R. 1918E, 934, 939. In Re Springfield Gas & E. Co. (Ill.) P. U. R. 1920A, 446, 454, reproduction cost based on average prices from 1913 to 1917, inclusive, was approved. In Fargo v. Union L. H. & P. Co., P. U. R. 1920A, 764, 774, a unit cost covering the average prices over a period of five years, with 1906 as the "index," was the basis on which reproduction cost was estimated. In Re St. Joseph Ry., L. H. & P. Co., P. U. R. 1920A, 542, it was ruled that the ratepayers should be required to pay a return only on the value of the utility based on average unit prices covering a period of one to ten years antedating abnormal war conditions, with new constructions at cost. In re Roanoke Waterworks Co., P. U. R. 1920C, 745, 748, the unit prices for five years preceding July 1, 1913, were employed in testing a rate which was to become effective February 1, 1920. The commission refused to apply the reproduction theory at present cost prices. In Re Chesapeake & Potomac Teleph. Co., P. U. R. 1920F, 49, 82, reproduction value at pre-war prices, plus actual sums necessarily expended during the period of inflation, was used.

## Value of Property.

Two engineers, H. P. Gillette, employed by the company, and C. S. Burns, by the city of Reno, acting independently, have furnished practically all the testimony as to the value of the company's property. Each has employed the reproduction cost method. Gillette's final valuation of $1,898,801, made January 1, 1920, is based on prices prevailing at that date. Burns values the same property at $703,098.11. In finding this value, he adopted an average of the prices prevailing over a period of five years immediately preceding April, 1917, the date of his investigation. To the value found he added the actual cost of improvements made between that date and January 1, 1920. It will be noted that the period thus selected permitted an averaging of 2½ years of war and 2½ years of pre-war prices. Such a method of obtaining the unit price has met with much approval. Certainly it is fairer than to apply war prices exclusively, and probably it is more equitable than to calculate present reasonable value by using pre-war prices and none other. I am therefore unable to say that the commission erred in giving the greater consideration to the Burns estimate. This conclusion will be fortified by even a cursory study and comparison of the reports of the two engineers.

Gillette appraised the property three times as follows:

*At prices prevailing in 1912:*

| | |
|---|---|
| Physical elements | $615,978 |
| Overhead | 164,473 |
| Water rights | 150.000 |
| Development cost | 163,773 |
| Additions to the plant at cost subsequent to January, 1912, and prior to January 1, 1920 | 145,392 |
| | $1,239,616 |

*At prices prevailing April 30, 1917:*

| | |
|---|---|
| Physical elements ............................................... | $847,568 |
| Overhead ...................................................... | 233,895 |
| Water rights .................................................. | 150,000 |
| Development cost ..... ........................................ | 163,773 |
| Additions at cost, subsequent to April 30, 1917, and prior to January 1, 1920 ........................................................ | 105,373 |
| | $1,500,609 |

*At prices prevailing January 1, 1920:*

| | |
|---|---|
| Physical elements ............................................. | $1,152,492 |
| Overhead ...................................................... | 317,943 |
| Water rights .................................................. | 150,000 |
| Development cost .............................................. | 163,773 |
| Additions ..................................................... | 114,593 |
| | $1,898,801 |

## More in detail Gillette's 1920 appraisal is as follows:

| | |
|---|---|
| Dams, canals, etc................................................ | $294,850 |
| Pump plant equipment ......................................... | 14,505 |
| Purification plant equipment .................................. | 10,762 |
| Reservoirs .................................................... | 85,950 |
| Mains ......................................................... | 696,247 |
| Fittings for mains ............................................ | 5,235 |
| Valves ........................................................ | 14,365 |
| Service connections ........................................... | 33,094 |
| Fire hydrant connections ...................................... | 0 |
| Paving over mains ............................................. | 2,202 |
| Bridges ....................................................... | 4,127 |
| Buildings ..................................................... | 12,476 |
| Telephone lines ............................................... | 1,934 |
| Tools and instruments ......................................... | 1,818 |
| Furniture and fixtures ........................................ | 1,650 |
| | $1,179,215 |
| Engineering .................................................. | 53,230 |
| Business management .......................................... | 53,232 |
| Law expenses ................................................. | 17,566 |
| Interest during construction ................................. | 59,432 |
| Contingencies ................................................ | 62,404 |
| Brokerage .................................................... | 65,524 |
| Stores and supplies .......................................... | 26,517 |
| Working cash capital.......................................... | 6,720 |
| Real estate .................................................. | 12,020 |
| Right of way ................................................. | 42,613 |
| Interest, etc., on real estate and right of way .............. | 6,555 |
| | $1,585,028 |
| Water rights ................................................. | 150,000 |
| Development cost ............................................. | 163,773 |
| | $1,898,801 |

The difference between his 1912 appraised value, plus actual cost of improvements and additions since that date, and his estimated cost of reproducing the same plant at 1920 prices, is $659,185, an increase of 53 per cent. Eliminating water rights and development cost, the valuation for 1920 is 71 per cent. greater than the valuation of 1912. This difference exceeds his appraisal of the entire physical features

of the plant in 1912, and is apparently due to changes in prices since that date, and not to substantial enlargements or extensions of the plant.

Gillette appraises the mains:

In 1912 at ................................................................ $397,918
In 1917 at ................................................................ 541,514
In 1920 at ................................................................ 696,247

He appraises overhead costs, which include engineering, business management, legal expenses, interest during construction, contingencies, and brokerage:

In 1912 at ................................................................ $164,473
In 1917 at ................................................................ 233,895
In 1920 at ................................................................ 317,943

Dams and canals he appraises:

In 1912 at ................................................................ $112,378
In 1917 at ................................................................ 199,751
In 1920 at ................................................................ 294,850

Thus between 1912 and 1920 the increase in value:

Of the mains was ......................................................... $298,329
Of the dams and canals ................................................... 182,472
In overhead costs ........................................................ 153,470
                                                                           ---------
    Total increase on the three items ................................... $634,271

The net revenue of the company was $8,782.32 larger in 1912 than in 1919, and the amount of water supplied in 1919 to Reno and Sparks was considerably less than in 1914, 1915, or 1917.

Burns' appraisement may be summarized as follows: The first column of figures contains the estimated cost of reproducing the plant; the second shows the reproduction cost less accrued depreciation:

Physical elements ................................. $580,692.26   $447,845.01
Overhead .......................................... 112,250.81     86,006.86
Going value ....................................... 86,915.00      86,915.00
Additions ......................................... 82,331.24      82,331.24
                                                    -----------   -----------
                                                    $862,189.31   $703,098.11

Gillette values the Hunter Creek rights of way, about 4.46 miles in length, at 50 cents a foot, or $11,795. Burns' valuation is $3,577. From its head in Hunter Creek canyon to the Hunter Creek reservoir, the ditch runs 6,680 feet over a high plateau, which is not under irrigation. From the reservoir to Reno, 16,910 feet, the water runs through a 20-inch wood pipe laid below the surface of the ground. For about one-third of this distance the right of way is through cultivated areas, and for the remainder of the distance it is through rocky land, or pasture. There is no evidence as to the width of the right of way, but, if it be assumed to be 110 feet, its area will amount to about 59.5 acres.

Under the rule announced in the Minnesota Rate Cases, 230 U. S. 352, 450, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the company should not be allowed a value in excess of the fair average market value of similar land in the vicinity.

As to such value the testimony is meager. Gillette says (Exhibit No. 1, p. 65) the 28 acres constituting the Hunter Creek reservoir site, where the ditch ends and from which the 20-inch pipe leads to the city, "was deeded to the company by John Sparks in exchange for stock. Estimated as agricultural land, at $50 per acre, $1,400. Apply public utility factor of 2, $2,800." At a price of $50 per acre, the land within the right of way, if it is 110 feet wide, is worth but $2,975.

The Highland ditch is 12.26 miles in length. The right of way is valued by Gillette at $16,183, or 25 cents per foot; by Burns at $3,135. If it be assumed to be 110 feet in width, it contains about 163.4 acres. A tract of 46 acres lying just below the Highland dam is appraised by each engineer at $20 per acre.

The Reno reservoir, into which the Highland ditch empties, occupies a tract of 13.8 acres. To this Gillette gives a value of $1,380, or $100 per acre, with a utility factor of 2½, making a total value of $3,450. Applying the principle announced in the Minnesota Rate Cases, a valuation of $40 per acre for this right of way will give a total value of $6,536, instead of $16,183. One hundred and ten feet is taken as the width of the right of way because it is ample, and therefore the company should not be permitted to charge its patrons for the use of any greater width, and also because the right of way granted by the government through the public domain for irrigation canals is 50 feet on each side of the marginal limits of the canal. 26 Stat. p. 1101, 8 Fed. St. Ann. p. 803 (Comp. St. § 4934); 28 Stat. p. 635, 8 Fed. St. Ann. p. 807 (Comp. St. § 4943).

Gillette's appraisal of real estate in 1917 was $9,220, of which $3,470 was utility value, added to the agricultural value of the reservoir sites. His appraisal of the rights of way in 1917 was $30,818, as against $8,377 by Burns. The $30,818 appears to have been made up thus:

Highland ditch .................................................... $16,183
Line to purification plant .......................................    280
Main to Sparks ..................................................    250
Highland ditch extension ........................................  2,310
Hunter Creek ditch and pipe line ................................ 11,795
                                                                  ───────
                                                                  $30,818

Adding the value of the Hunter Creek line, $11,795, a second time, he obtains his valuation of $42,613, as the value January 1, 1920. Doubtless this is a clerical error. His total valuation of $12,020 for real estate is made up as follows:

Highland intake .................................................. $   400
Right to construct dam ...........................................   1,000
46 acres, occupied tender's dwelling .............................     920
Filter plant site ................................................     400
Intake Reno reservoir ............................................     250
Reno reservoir ...................................................   3,450
Hunter Creek reservoir site ......................................   2,800
                                                                    ───────
                                                                    $9,220
Adding Highland Canal reservoir site a second time................   2,800
                                                                    ───────
    The result is value in 1920 ..................................  $12,020

This also is probably a clerical error.

If from Gillette's total 1920 valuation for real estate and rights of way ............................................................ $54,633
We deduct
Clerical errors .......................................... $14,595
Utility value on the reservoir sites ...................... 3,470
And as excess on the rights of way ....................... 18,467   36,532

The remainder ................................................ $18,101

is not so startling as compared with Burns' total valuation for the same items of $15,717.

### Reno Reservoirs.

In 1917 Gillette's valuation was $58,852.

Burns estimated the reproduction cost at ...................... $50,298.73
from which he deducted the depreciation on piping and timber structures ................................................ 2,532.63

Leaving a then present value of ........................ $47,766.10

Gillette has added to his appraisal $27,098, none of the details of which are given, except the fact that $2,779 of that amount is for additions prior to January 1, 1920, making the total reproduction cost of the reservoirs for January 1, 1920, $85,950. Gillette's valuation in 1912 was $84,792, when his cost for excavation was 75 cents per cubic yard, as against 45 cents in 1917, and Burns' 40 cents per cubic yard in the same year. According to Gillette, there were 4,569 cubic yards of riprap, at $3.30 per yard. Burns, however, found but 3,470 cubic yards, at $2.50 per yard, a difference of 1,099 cubic yards in quantity and $6,403 in cost.

In the Hunter Creek reservoir the excavations, according to Burns, amount to 26,600 cubic yards, costing 40 cents per cubic yard, or $10,-640. Gillette finds 27,060 cubic yards, costing 85 cents per cubic yard, or $23,001. Of riprap, Burns finds 230 cubic yards, costing, at $2.50 per yard, $575. Gillette finds only 23 cubic yards, costing, at $1.70 per yard, $39.

### Highland Ditch.

In Gillette's report it is stated the length of the Highland ditch, from intake to reservoir diversion, is 63,360 feet, classified as follows:

Flume .......................................................... 3,966 feet.
Tunnel ......................................................... 184 feet.
Inverted siphon (incline measurement) .......................... 571 feet.
Canal in earth, loose rock, and rock ........................... 58,639 feet.

The Highland ditch proper involved the excavation of 148,641 cubic yards of earth, loose and solid rock, according to Gillette, and of but 106,060 cubic yards according to Burns, a difference of 42,581 cubic yards. Gillette has 77,100 cubic yards of earth, at 40 cents per yard; Burns, 31,000, at 30 cents per yard. Gillette has 59,190 cubic yards of loose rock at 85 cents per yard; Burns, 71,400, at $1 per yard. Gillette has 12,351 cubic yards of solid rock, at $1.45 per cubic yard; Burns has 3,660, at $2 per yard. Gillette finds 2,825 cubic yards of riprap, at $3.30 per yard; Burns finds 1,530 cubic yards, at $1.25

per yard—a difference of 1,295 cubic yards in quantity and $7,410.50 in cost. Gillette finds 650 cubic yards of concrete; Burns, 1,027. Burns estimates the reproduction cost of concrete at $13 per cubic yard, while Gillette places it at but $10.

In illustration of the differences, it is enough to say that 42,581 cubic yards of excavation is sufficient for a canal 8 miles long, having a uniform width of 9 feet and a uniform depth of 3 feet. A difference of 8,691 cubic yards in the quantity of solid rock excavation is sufficient for a similar canal more than a mile and a half in length.

The Highland ditch extension is about 8,810 feet in length, of which 380 feet is flume. According to Gillette it required 13,840 cubic yards of excavation; Burns says 7,825 cubic yards, a difference of 6,015 cubic yards. Gillette found that 1,690 cubic yards of solid rock were excavated in constructing this ditch; Burns says 265, a difference of 1,425 cubic yards. Gillette says 1,805 cubic yards of loose rock; Burns says 985, a difference of 820 cubic yards. Gillette says 10,345 cubic yards of earth; Burns says 6,575, a difference of 3,770 cubic yards.

### Pipe in Reno.

Gillette finds 29,963 feet of riveted steel pipe, the reproduction cost of which he estimates at $155,936. Burns finds only 26,488 feet, the reproduction cost of which he fixes at $62,113. There is thus between the two estimates a difference of 3,475 feet in the length of the pipe, and $93,823 in cost. The 22-inch riveted steel pipe reported by Gillette exceeds that of Burns by 844 feet.

It is impossible from the evidence to determine which is correct, and, as the burden is on the company to establish its case, we may take 26,488 feet as the amount of such pipe in Reno. The average cost, according to Gillette's 1917 estimate, would be $5.20 per foot; according to Burns, $2.34. If Gillette's cost per foot is correct, his overestimate on the length of the pipe requires a reduction of about $18,000 in his 1917 valuation. Gillette says there were 7,365 feet of 12-inch No. 6 pipe in this item; Burns says 7,277 feet, a difference of 88 feet. Gillette values this pipe at $3.90 per foot; to this may be added $1.02, the average of his estimated cost per foot for laying riveted steel pipe in Reno, making $4.92 per foot, or a total of $36,235.80. According to Burns, such pipe was worth $1.55 per foot, to which he adds 50 cents for placing it in the ground, making his appraised value in 1917 $2.05 per foot, or a total of $14,917.85.

Bearing in mind that these estimates were made in 1917, we find, on turning to Petitioner's Exhibit No. 7, that in June, July, and August, 1918, $5,246.43 was the "actual total" cost of laying 1,304 feet of 12-inch riveted steel pipe on Riverside avenue, Reno, or $4.02 per foot. This is 90 cents per foot less than Gillette's cost, estimated under the prices of 1917. His estimate on this item alone exceeds by $6,628 what it would have cost the company to lay the same 7,365 feet of pipe in August, 1918. In other words, Gillette's estimated cost, based on 1917 prices, is 22 per cent. greater than the actual total cost would have been, if the company had laid the same pipe in 1918. I find nothing specific in the evidence showing the actual cost to the company of laying pipe of other kinds, or of riveted steel pipe of other sizes.

Of cast iron ball and spigot pipe, Gillette reports 960 feet, and Burns 760 feet; a difference of 200 feet, with a difference in reproduction cost of $633. Of converse lock-joint pipe, Gillette reports 102,033 linear feet, Burns 111,030 feet; a difference of 8,997 linear feet, or 1.7 miles.

### Pipe and Fittings in Sparks.

Burns estimates the fittings for mains in Sparks and Reno at $2,-523.70. Gillette's estimate for the same items in 1917 was $3,327; in 1920, $5,235. Burns estimates the present value, after deducting depreciation, at $1,885.94. Among these fittings at Reno, Burns finds 262 saddles, which he values at $609; while Gillette finds only 162, which he values at $195.

In Sparks there is a striking difference between the estimates of the two engineers as to kind, quantity, and value of pipe. For instance, Burns finds 29,121 feet of converse lock-joint steel pipe, which he values at $17,365.08, with a present value, after deducting depreciation, of $14,563.08. Gillette finds but 22,258 feet of converse lock-joint steel pipe, which he values at $15,985. The difference in length of this kind of pipe is 6,863 linear feet, or 1.3 miles. According to Gillette, there are in Sparks 18,507 feet of riveted steel pipe, valued by him in 1917 at $66,935. According to Burns there are but 17,199 feet, which he values at $28,605.08; after deducting depreciation, his present value is but $17,499.10. The difference as to estimated length of pipe is 1,308 feet. Gillette also reports 200 feet of valueless riveted steel pipe in Sparks. Burns has 453 feet of 18-inch pipe, 190 feet of 12-inch pipe, 120 feet of 8-inch pipe, and 1,543 feet of 4-inch pipe more than is given in Gillette's appraisal. Notwithstanding these differences, the total length of pipe given by Burns for Sparks exceeds Gillette's measurement only 1,715 feet.

### Stores and Supplies.

Gillette's appraisal of stores and supplies, totaling $26,517, has items like this:

Inventory Reno storehouse, December 1, 1916.

| | |
|---|---:|
| Water department supplies at prices at which they were originally taken in | $ 4,516 |
| Cast iron pipe on hand at Reno | 1,909 |
| Lead on hand at Reno, about | 300 |
| Filtration supplies (aluminum sulphate, etc.) | 3,500 |
| Materials ordered, but not yet received | 13,415 |

At the Vine street bridge, Gillette finds 36 cubic yards of excavation, costing $126; Burns, 63 cubic yards of excavation, costing $189. Gillette finds 103.8 cubic yards of concrete, costing $1,038; Burns, 167 cubic yards of concrete, costing $1,837. Gillette finds 10,500 feet of lumber, costing $588; Burns finds 17,000 feet of lumber, costing $595. Gillette valued the bridge in 1917 at $2,144; Burns, at $2,843.90. With a then present value, after deducting depreciation, of $2,360.44, Gillette's value in 1920 was $4,127.

## Overhead.

Gillette estimates overhead cost of reproducing the plant new as follows:

| | |
|---|---:|
| Engineering | $53,230 |
| Business management | 53,232 |
| Law expenses | 17,566 |
| Interest during construction | 65,987 |
| Contingencies | 62,404 |
| Brokerage | 65,524 |
| Total | $317,943 |

This sum is 25 per cent. of Gillette's valuation, $1,267,085, of the physical elements of the property, exclusive of overhead, water rights, and development cost.

Burns' estimate of overhead expenses is as follows (the first column contains reproduction cost new; the second column reproduction cost new less depreciation):

| | | |
|---|---:|---:|
| Engineering | $39,432.30 | $30,165.20 |
| General construction costs | 28,165.92 | 21,546.56 |
| Interest during construction | 44,652.59 | 34,295.10 |
| | $112,250.81 | $86,006.86 |

Burns' estimate of overhead costs is about 16 per cent. of his total valuation of the physical property, exclusive of water rights and going concern, less depreciation, or 19 per cent., if additions also are excluded.

[10] The argument in favor of an allowance for brokerage is not convincing. The basis of the rate is the reasonable value of the property. What it costs is a circumstance to be considered in determining its reasonable value. So, also, is the interest on money during construction. One man constructs a utility plant with his own money, or with money which he is able to borrow on his own credit, and therefore pays no brokerage or discount. Another has no money of his own, and but indifferent credit; in order to procure money to purchase or construct the plant, he is obliged to employ a broker, and issue stock and bonds, probably at a discount, which may be much or little, varying with his credit, and the probability that his enterprise will be profitable. Other things being equal, why should the second plant be valued higher than the first? Money must be used in the construction of a plant, and the reasonable value of its use is as real and essential an element in the reasonable value of the property as the labor of the men who dig the canals; hence reasonable interest during construction is a proper item in calculating reproduction cost, whether the owner uses his own funds or borrowed money. But the expense incurred in promotion, selling stock and bonds, or in otherwise procuring money on which interest will be paid, adds nothing to the value of the plant. It is to be classed with interest paid on bonded debts. The owner will receive a fair return on the reasonable present value of his property devoted to public use; this is all he is entitled to, and out of this it is but just that he should pay his debts, the principal and interest due on his bonds, and any expense which he has incurred in procuring funds, whether it

be in the sale of stock and securities, or for promotion, brokerage, discount, or bonuses, and for this, if his enterprise is prudently conceived and conducted, his return will be sufficient compensation, as in the instant case the rate of return on the property is larger than the rate of interest paid on the bonds. 1 Whitten, Valuation Pub. Serv. Corp. p. 268; In re Western Colorado Power Co., P. U. R. 1918E, 629, 644; Galveston Elec. Co. v. City of Galveston (D. C.) 272 Fed. 147, 157.

In Cedar Rapids Gaslight Co. v. Cedar Rapids, 144 Iowa, 426, 120 N. W. 966, 48 L. R. A. (N. S.) 1025, 138 Am. St. Rep. 299, the court said:

"Nothing can be allowed for the promotion and organization of the company, for it is immaterial by whom the plant may be owned in estimating its value."

There is nothing in the record which demands a large allowance for contingencies. During original construction there are always unexpected difficulties and emergencies; there are also changes and alterations to adapt the component parts of the plant to each other. But when the plant is reconstructed such contingencies are relatively few. The equity of such an allowance to cover omissions is not clear. The tendency of appraisers seems to be quite as strong to overestimate as to underestimate quantity, quality, numbers, and value. The company here has not supported its claim for overhead allowances by any record of expenses actually incurred, but relies entirely on expert opinion based on conditions more or less hypothetical. Obviously such estimates must be largely speculative. Some of the overhead percentage rates on inventory cost of property noted in the course of this investigation are as follows:

In Lincoln Gas & Elec. Co. v. Lincoln, 182 Fed. 926, 928, 32 Sup. Ct. 271, 56 L. Ed. 466, 7.7 per cent. on a total reproduction new value of $565,741. There was an allowance for contingencies, but nothing for interest during construction.

In Pioneer Teleph. & Teleg. Co. v. Westenhaver, 29 Okl. 429, 118 Pac. 354, 356, 38 L. R. A. (N. S.) 1209, about 14 per cent. was allowed.

The Wisconsin Railroad Commission for a time refused to allow more than 10 per cent.; later it was increased to 15 per cent. Milwaukee v. Commission, P. U. R. 1920B, 976, 984. 1 Whitten, Valuation Pub. Serv. Corp. p. 238; note, 48 L. R. A. (N. S.) 1052.

In Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 162, 35 Sup. Ct. 811, 59 L. Ed. 1244, 15 per cent. was allowed.

In Westminster v. Consolidated Pub. Util. Co. (Md.) P. U. R. 1919E, 506, 518, 13 per cent. was allowed.

In Fargo v. Union Light, Heat & P. Co. (N. D.) P. U. R. 1920A, 764, 780, 12 per cent. was allowed.

In Wiseman v. Rupert Elec. Co. (Idaho) P. U. R. 1919A, 553, 15 per cent. was allowed.

### Depreciation.

Plaintiff alleges that the actual depreciation of its plant and equipment, exclusive of water rights, has been and now is in excess of 2 per cent. per annum, and that it should be allowed an annuity of $32,000. This is 2 per cent. on a valuation of $1,600,000. The commission, in

the order complained of, allowed an annuity of 1 per cent. on a valuation of $800,000. While the record affords little information as to the early history of the plaintiff company, it is quite certain the plant has been in operation since 1892. The accrued depreciation during that period—28 years—is estimated by Gillette at $164,889. Report for 1917, pp. 70 to 81, inclusive. This was calculated in 1917. Burns estimates the total depreciation prior to December 31, 1919, at $159,-091.20. Burns' Report, p. 2. Deducting this amount from his total estimated reproduction cost, the remainder, $703,098.11, is his present reasonable value of the plant, exclusive of water rights.

If the accrued depreciation of 28 years is no more than $164,889, the claim that the company is entitled to an annuity of $32,000, needs substantial support to warrant allowance. I am not prepared to hold that an annuity of 2 per cent. on the value of the structural portions of plaintiff's plant is unreasonable; equal allowances for depreciation have frequently been granted, but the clear preponderance of the evidence does not indicate that $1,600,000 worth of property subject to depreciation is employed by the company in furnishing water, or that an annuity of but $8,000 is so low as to be in effect confiscatory.

### Development Cost or Going Value.

[11] Gillette, in his valuation of $1,898,801, has made no allowance for accrued depreciation, though it has been taken care of in connection with what he terms development cost, as follows: He estimates development cost prior to 1917 at $452,993, and claims this covers accrued depreciation, and $163,773, which he has actually added to his undepreciated valuation for development cost or going value. These figures, $452,993, are obtained by subtracting the annual net income for the years prior to 1917 from the total income which the company would have received during that period, had it enjoyed a net annual return of 10 per cent. prior to 1906, and 9 per cent. thereafter. The calculation was performed in the following manner:

Estimating a value of $629,008 for the property, exclusive of water rights, at the close of the year 1906, he adds $138,920, estimated then total deficiency in income, making a value of $767,928 for 1907; a 9 per cent. revenue on this is $69,114. The actual apparent net return for that year was only $44,128; the difference, $24,986, termed the deficit or development cost for that year, with costs of new constructions amounting to $57,941, he adds to the value for 1907, making the total value for 1908, $850,855. The difference between a 9 per cent. net return on this sum and the apparent net return is $22,044. This, in turn, is added to the valuation of the previous year, and thus, by capitalizing such deficits annually, Gillette finds at the close of 1916 that the plant value has advanced to $1,245,121, and the total development cost to $452,993. It should be noted, however, that more than half of the deficiency of 1907 is due to the failure to collect a 9 per cent. income on the aggregate previous deficit of $138,920, and the net income for that year, $44,128, is more than 7 per cent. on a valuation of $629,008. But for this capitalized deficiency demanding a 9 per cent. return, there would have been no deficiency in 1908.

Thus what Gillette has actually done is to add together (1) his estimated cost of reproduction new, (2) between $300,000 and $400,000 for development cost, and (3) $150,000 for water rights, making a total of more than $2,000,000, from which he deducts $164,889, or thereabouts, accrued depreciation, leaving $1,898,801. Thus $452,993 is the difference between the actual net income and what the witness considers would have been a fair return on a more or less assumed valuation of the property, increased by capitalized deficiency of income.

What the company is entitled to receive is a fair return on the reasonable value of the property at the time it is being used for the public. Deficiency of income is not reasonable value; it is not property which is being used for the public. If it is assumed to be the cost of developing business, it is original cost, not present reproduction cost, nor necessarily equivalent to the reasonable value of the established business; and in so far as it exceeds the reasonable value of the established business, it operates to require present customers to pay part of the rates which were not collected from former customers. If the so-called development cost is enhanced value due to the fact that the plant is a going concern and earning money, rather than a plant without business, it is a property right, and should be considered in determining the value on which the owner is entitled to a fair return.

What, then, is the difference in value of the company's water plant, with its present business established, and the same plant in the same community ready to do business, but as yet having none? If the plant is ready for immediate use, the cost of assembling its parts and preparing it for service has, or should have been, considered and covered in the estimates for the physical property and overhead expenses. With the plans so developed, how long would it take, and what would it cost, to secure the present patronage, and to organize and have in full operation the present business system? The company deals in water, a commodity which the community must have, and will immediately purchase. There is no competition, and little or no advertising or soliciting would be required. Is it possible to conceive how a prudent man, familiar with the business, could or would spend $452,000, or $163,000, or even $86,000, in transforming such a plant, under the conditions prevailing in Reno to-day, into a going concern having business and a patronage equal to that now enjoyed by plaintiff? Speculative values afford no just basis for a judicial declaration that rates are confiscatory.

It is not to be assumed without clear proof that present customers are bound to make up alleged former losses or deficiency in the company's income. If there are deficiencies and losses which should be capitalized, to the end that the company may recover them from its present and future patrons, the burden is on the company to establish at least the character and extent of such deficiencies by clear and definite evidence. This it has failed to do. The record shows that it owns and operates three properties: A gas plant, an electric light and power plant, and a water distribution system, which, according to Gillette's 1912 report, was worth in 1892, $227,839. Its capitalization is $1,000,000; its bonded debt, $750,000. There is no history of any

other bond or stock issue; hence this may be accepted as measuring the investment. Between January 1, 1892, and January 1, 1920, the apparent net earnings of the company were $2,593,318; its new constructions then amounted to $1,651,888. Between July 10, 1910, and December 31, 1919, while the amount of its issued stock and bonds remained stationary, it paid the interest on its debts, and also an average annual dividend on its capital stock of 8.53 per cent., and at the end of that period it had accumulated a surplus of $596,383.20, and the cost of the plant as reported to the commission was $2,386,201.05.

I am unable to state the dividends, if any, between January 1, 1892, and December 31, 1910; but the net earnings of the company in all departments during that period, as given by Gillette, were $1,035,406. The gross earnings of the water plant from July 1, 1910, to December 31, 1919, were $903,005.53. The net earnings during the same period were $518,616.28. No losses are apparent here which in justice should be capitalized at the expense of the ratepayers for the benefit of the company. This is said without losing sight of plaintiff's undoubted right to a just return for the use of its water plant, without regard to the income from the remainder of its property.

In Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 162, 171, 35 Sup. Ct. 811, 59 L. Ed. 1244, a master, by the reproduction cost method, fixed the reasonable value of structures at $1,975,026. To this he added $296,254, or 15 per cent., for overhead costs; he then deducted $333,-878 for depreciation, and thus reached the figure $1,937,402, to which he added enough for working capital, real estate, organization, etc., to make $2,100,000. He was disposed to allow $300,000 additional for going value as a separate item, but after the decision in the Cedar Rapids Case, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, he cut out this item, saying he regarded that case as decisive that going value should not be considered in determining the basis on which the complainant is entitled to have its return "beyond the fact that it [the plant] is in successful operation." The Supreme Court of the United States sustained the decision of the master, because, though the latter had eliminated $300,000, "he had already valued the property in the estimate of what he called its physical value, upon the basis of a plant in actual and successful operation; for he said that otherwise its value would be much less."

In the Cedar Rapids Case, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594, and on writ of error from the Supreme Court of Iowa (144 Iowa, 426, 120 N. W. 966), the witnesses had testified to an enhanced value of $100,000 because the plant was a going concern, but in giving this estimate they took good will into account, and for this reason the Supreme Court of the state rejected the item and dismissed the bill. The decision was sustained by the Supreme Court of the United States.

In Galveston Elec. Co. v. City of Galveston (D. C.) 272 Fed. 147, 159, the court used the following language:

"In view of the valuation used by the master in this case of historical reproduction cost, with an appreciation added for the present-day valuations, with all overheads * * * properly added and allowed for, taking the city of Galveston as it is, with a street car service already fully developed, and a public demanding street car service, and certain to take advantage

of it, an allowance for going concern in this case, in addition to the allowances already made, as a basis for enjoining the exercise of a legislative prerogative, must be discarded."

In Re York County Water Co. (Me.) P. U. R. 1921A, 444, the Public Utility Commission of Maine, in a total valuation of $780,373, allowed $62,000, or 8.6 per cent., for going value.

In Re Cairo Water Co., P. U. R. 1921A, 764, the Public Utility Commission of Illinois made allowance of $30,000, or 9.6 per cent., for going value; the total value of the plant being fixed at $400,000.

In Re Laporte Gas & Elec. Co. (Ind.) P. U. R. 1921A, 824, 866, a going value of $40,000, or 7.7 per cent., was allowed in a total valuation of $560,250.

In the last trial of the Spring Valley Case (D. C.) 252 Fed. 979, 985, the master's allowance of $3,400,000 for going concern, in a total value of $39,000,000, was reduced to $1,400,000, or 4.44 per cent. in the final valuation of $34,000,000.

In Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, 11 per cent. was allowed in the lower court.

In Omaha v. Water Co., 218 U. S. 180, 202, 30 Sup. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084, 9.8 per cent. was allowed.

In my judgment, Burns' estimate of $86,006, in so far as it is for development cost, is not called for by the evidence, and, if it be for going concern value, it is excessive.

[12] Much stress has been laid on the following language found in the decision rendered in this case by the Nevada commission:

"$800,000 may properly be taken as a fair valuation of the property for rate-making purposes. The present reproduction cost was not considered, as it is believed to be abnormal. In so far as practicable, the original costs were accepted as the basis of valuation, with due allowance for additions, renewals, etc., under prevailing prices. Working capital, stores, and supplies, and other items of this character, are allowed for in the above figures."

There was practically no testimony as to original cost; hence such cost could neither have been considered nor accepted by the commission. What it probably did was to start with $703,098.11, the reproduction cost less depreciation, plus additions at cost, as calculated by Burns. This amount was increased by allowances for working capital, for stores and supplies omitted by Burns, and by enough more, after considering all the evidence, to make $800,000, which the commission regarded as the reasonable value of the plant, exclusive of water rights.

Whether this explanation is correct or not, the court is bound to regard $800,000 as the reasonable value of the plant until the contrary appears. The burden of showing the contrary is on the party attacking the rates. The theory on which the commission proceeded may be utterly indefensible, but until it is shown that the result, in and of itself, regardless of the method by which it was obtained, is unfair, and in effect confiscatory, enforcement of the order complained of cannot be restrained. It is the result, not the method of obtaining it, which is to be tested.

I am unable to regard Gillette's estimate as reasonable value. The method pursued of applying prices prevailing January 1, 1920, exclu-

sively, is not calculated to yield fair valuation. Burns gave substantially the only other evidence on that subject. The Burns report shows the unit prices applied, and how they were calculated, but not the data on which the calculations were based. Gillette's report shows the unit prices applied in making his estimates of 1912 and 1917, but as to prevailing prices January 1, 1920, there is little or no definite information. The appraisal of that date was apparently made by adding sufficient percentages to the values of 1917 to raise them to what the engineer conceived would be reproduction cost new at January, 1920, prices.

Where the two engineers disagree as to kind, quantity, number, or price, as a rule there is nothing in the record from which it is possible to determine which or what is correct. The answer may easily be construed as an admission that the property is worth approximately $800,-000, exclusive of water rights, if an ample supply of water be available, and that the right to the use of the 75 second feet of water from Truckee river and Hunter creek, though plaintiff is not entitled to a valuation thereof, is worth $150,000. In my opinion, there is no preponderating evidence in the record which requires a higher valuation for either.

As to the water right, if there is such an abundant supply that the company can allow 15 second feet to escape over the spillways into the river, 5 second feet to pass over its dams, and 12 second feet to be lost as seepage in the Highland ditch, a higher valuation than $150,-000 for the entire 75 second feet cannot be justified. Furthermore, plaintiff's customers do not use, including the loss by seepage and wasteful toilets, more than 55 second feet during the irrigating season, or more than 28 second feet at other seasons of the year.

These circumstances do not, in my judgment, permit any higher valuation for the used water rights than $100,000. The annual net return, if the rates fixed by the commission are enforced, is estimated at $64,000, plus $8,000 for a depreciation annuity, making a total of $72,000. This is sufficient to allow a depreciation annuity of $8,000, and a net return of 7.11 per cent. on a $900,000 valuation for the company's property.

[13] The commission has determined that a net return of 8 per cent. on the reasonable value of the property is fair. As to this I have no criticism, but I have been unable to find a case, and none has been called to my attention, in which a court has ever held that a rate yielding as much as 7 per cent. net per annum on the value of the property devoted to the service of the public is confiscatory.

In Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 268, 39 Sup. Ct. 454, 63 L. Ed. 968, the court found that the net return in 1907, and again in 1912, was close to confiscation, if not below it, and in other years it was at least 7 per cent. The undisputed evidence showed that 8 per cent. was the lowest rate sought and generally obtained as a return upon capital invested in the vicinity, and 7 per cent. was the legal rate of interest in Nebraska. The lower court refused to find the rates complained of were confiscatory, and dismissed the cause. The Supreme Court modified the decree only to the extent of directing that the dis-

missal should be without prejudice. Here the court had an opportunity to declare a 7 'per cent. net return, under conditions like those in the instant case, confiscatory, but did not do so.

The present case will be dismissed, but without prejudice.